

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK
# BUFFALO DIVISION

| | |
|---|---|
| **Carlanda D. Meadors,** an individual, et al.,<br><br>  Plaintiffs,<br><br>vs.<br><br>**Erie County Board of Elections,**<br><br>  Defendant. | Case No. 21CV982-JLS<br><br>**Plaintiffs' Memorandum of Law in Support of their Motion for a Temporary Restraining Order** |

The plaintiffs respectfully submit this memorandum of law in support of their motion for a temporary restraining order. As explained below, Section 6-158.9 of the New York Election Law, which requires independent candidates to file their nominating petition at least 23 weeks before a general election, is unconstitutional as applied here. The plaintiffs therefore seek an order prohibiting Erie County election officials from enforcing the petition deadline and requiring them to place

the name of Byron W. Brown on the 2021 general-election ballot as an independent candidate for Mayor of the City of Buffalo.

## Background[1]

The question presented by this case is whether New York's early filing deadline, as applied to an independent candidate for Mayor of the City of Buffalo, violates the First and Fourteenth Amendment rights of the candidate and his supporters.

Before 2019, New York's petition deadline for independent candidates was never more than 77 days before the general election. (Compl. ¶¶ 11-15.) In 2019, however, the Legislature changed the deadline to "not later than twenty-three weeks preceding" a general election. Act of January 24, 2019, ch. 5, § 13, 2019 N.Y. Laws 9, 14 (codified at N.Y. Elec. Law § 6-158.9). That date falls in late May, 161 days before the general election; 28 days before the non-presidential primary election; and 107 days before the deadline by which county boards of election are required to determine the candidates who will appear on the general-election ballot. (Compl. ¶ 16.)

---

[1] Unless otherwise noted, all facts come from the plaintiffs' verified complaint.

2

In 2021, the general election is scheduled for November 2. The petition deadline for independent candidates therefore fell on May 25, 2021. The non-presidential primary election was held on June 22. And the deadline for county boards of election to determine the candidates who will appear on the general-election ballot is September 9. (Compl. ¶ 19.)

The plaintiffs are three individual supporters of current Buffalo Mayor Byron W. Brown, who is running for re-election as an independent candidate. Brown initially sought re-election in 2021 as the nominee of the Democratic Party but was defeated in the primary election. Brown's supporters then launched an effort to nominate him as an independent candidate for mayor in the general election. Brown's supporters gathered signatures of eligible voters in the City of Buffalo and filed their nominating petition containing more than the requisite number of signatures with the Erie County Board of Elections on August 17, 2021. The petition would have entitled Brown to a place on the ballot if it had been filed on or before May 25, 2021, and it would have been timely under all of New York's petition deadlines in force before 2019. (Compl. ¶¶ 19-24.)

The Erie County Board of Elections rejected the nominating petition on Friday, August 27, 2021, because the petition had not been filed by the deadline set out in Section 6-158.9 of the New York Election Code. The plaintiffs filed this case on the following business day and immediately sought a temporary restraining order.

**Legal Standard**

A plaintiff seeking a temporary restraining order or preliminary injunction must demonstrate that: (1) there is a substantial likelihood of success on the merits; (2) it will suffer irreparable injury if relief is not granted; (3) the threatened injury outweighs any harm the requested relief would inflict on the non-moving party; and (4) entry of relief would serve the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997) (standard for obtaining TRO is identical to the standard for a preliminary injunction). When, as here, a plaintiff "seeks a preliminary injunction that will alter the status quo," it must "demonstrate a 'substantial' likelihood of success on the merits." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (citation omitted).

## Discussion

**I.    The plaintiffs are likely to succeed on the merits.**

To determine whether New York's petition deadline for independent candidates violates the First and Fourteenth Amendments as applied here, this Court must apply the balancing test set out by the Supreme Court in *Anderson v. Celebrezze*:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Under this test, the level of scrutiny varies on a sliding scale with the extent of the asserted injury. When, at the low end of the scale, the law "imposes only 'reasonable, nondiscriminatory restrictions' upon First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are general sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 788, 788-89 n.9). But when the law places discriminatory or "severe" burdens on the

5

rights of political parties, candidates, or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance." *Id.* at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). *See, e.g., Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 177 (2d Cir. 2020) (discussing "the *Anderson-Burdick* framework").

The plaintiff bears the burden of proof on the first step in the *Anderson* test, and the defendant bears the burden on the second and third. *Burson v. Freeman*, 504 U.S. 191, 199 (1992); *Moore v. Martin*, 854 F.3d, 1026 (8th Cir. 2017); *Nader v. Brewer,* 531 F.3d 1028, 1039-40 (9th Cir. 2008); *Lopez Torres v. New York State Bd. of Elections,* 462 F.3d 161, 203 (2d Cir. 2006), *rev'd on other grounds* 552 U.S. 196 (2008); *Patriot Party v. Allegheny Cnty. Dept. of Elections*, 95 F.3d 253, 267-68 (3d Cir. 1996*)*.

A.   **The Character and Magnitude of the Injury**

Beginning with *Anderson*, the Supreme Court and many others have recognized that early filing deadlines impose burdens on candidates and their supporters. For candidates, the burdens are obvious: they cut off the ability to enter a race "even if intervening events create unanticipated political opportunities." *Anderson*, 460 U.S.

at 786. But early deadlines also harm voters, who "can assert their preferences only through candidates or parties or both." *Id.* at 787. As a result, "the right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot." *Id.* (quoting *Lubin v. Panish*, 415 U.S. 709, 716 (1974)). The exclusion of candidates also burdens the voters' freedom of association, "because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens." *Id.*

In analyzing the character and magnitude of those burdens in *Anderson*, the Court placed particular emphasis on the fact that Ohio's deadline was discriminatory: it gave major parties "the political advantage of continued flexibility" to develop their candidates and positions even after the independent-candidate deadline. *Id.* at 791. Early deadlines also restrict an independent candidate's opportunity to garner support from voters who are dissatisfied with the positions of the major parties because those voters rarely become "a cohesive or identifiable group until ... [the] major parties stake[] out their positions

and select[] their nominees." *Id.* at 791-92 (quoting *Williams v. Rhodes*, 393 U.S. 23, 33 (1968)).

Early deadlines burden independent-minded voters in a similar fashion, "den[ying] the 'disaffected' not only a choice of leadership but a choice on the issues as well." *Anderson*, 460 U.S. at 792 (quoting *Williams*, 393 U.S. at 33). Ohio's deadline also harmed voters by excluding candidates "whose positions on the issues could command widespread community support." *Anderson*, 460 U.S. at 792. "By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas." *Anderson*, 460 U.S. at 794.

For these reasons, the Supreme Court found that Ohio's deadline for independent candidates 75 days before the major parties' primary election (a date that fell on March 20), 460 U.S. at 783 n.1, deserved strict scrutiny. *Id.* at 790-795.

Relying explicitly on the concerns about early deadlines expressed in *Anderson*, the Ninth Circuit found that Arizona's deadline for independent candidates 90 days before the state's primaries—a date

that fell in early June—imposed "severe" burdens that warranted strict scrutiny. *Nader v. Brewer*, 531 F.3d 1028, 1039 (9th Cir. 2008). The district court had held that *Anderson* was not controlling because some of facts present in *Anderson* were not present there: Arizona's presidential preference primary had already taken place; the major-parties' candidates and platforms were already well known; and the level of public interest was already high by the June deadline. *Id.* at 1038. But the Ninth Circuit reversed, concluding that the Supreme Court's concerns in *Anderson* controlled even though those facts were not present in the specific election at issue. *Id.*

In *Cromer v. South Carolina*, 917 F.2d 819, 823-24 (4th Cir. 1990), the Fourth Circuit also relied heavily on *Anderson* in striking down South Carolina's March 30 filing deadline for independent candidates for the state legislature. Although the burden of filing a simple notice of candidacy was minimal, the court found that the character and magnitude of the injury to the voters was "practically total" because of the timing. *Id.* at 824. "It effectively cuts off the opportunity for such candidacies to develop at a time that pre-dates the period during which the reasons for their emergence are most likely to occur." *Id.*

9

In *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997), the Third Circuit addressed New Jersey's filing deadline for independent and third-party candidates 54 days before the primary election. In reversing the district court's denial of a preliminary injunction, the court noted that the deadline imposed "a substantial burden on both candidates and voters" that outweighed the state's asserted justifications. *Id.* at 880 n.3; *see also id.* at 881. "*Anderson* suggests that a state must be able to point to a particularly strong countervailing interest in order to justify a filing deadline that requires alternative candidates to file nominating petitions before the major political parties have chosen their candidates for the general election." *Id.* at 880 n.3.

Other cases abound. *See, e.g., Populist Party v. Herscher*, 746 F.2d 656, 661 (10th Cir. 1984) ("The June 1 deadline … appears to run counter to the views in *Anderson*"); *Moore v. Martin*, Civ. No. 4:14-cv-65, 2018 WL 10320761 at *3 (E.D. Ark. Jan. 31, 2018) (March 1 deadline unconstitutional); *Nader 2000 Primary Cmte., Inc. v. Hazeltine*, 110 F. Supp. 2d 1201, 1208 (D.S.D. 2000) (deadline on "the third Tuesday" in June is unconstitutional under *Anderson*). The general principle that

emerges is that early filing deadlines for independent candidates—particularly those that fall substantially before the major parties select their nominees—are constitutionally suspect.

And so it is here. New York's filing deadline for independent candidates is four weeks before the state's primary elections and almost six months before the general election. This means that the opportunity to run as an independent candidate is effectively cut off as of May 25, and the opportunity for voters disaffected with the major parties' nominees to coalesce around an alternative candidate is cut off as well. "History … ends" for both independent candidates and their supporters on that date. *Anderson*, 460 U.S. at 800. In practical terms, this means that as of May 25, New York law effectively precludes candidacies that respond to newly emerging issues, to shifts in the positions supported by the major parties, or to major-party nominees whose views lie outside the political mainstream. And it gives major parties the advantage of continued flexibility that is denied to all others.

Brown, like John Anderson, is a genuine candidate who could command widespread community support in the general election. But New York's early filing deadline cut off that opportunity before it began.

11

And disaffected Buffalo voters will have no other candidates on the general election ballot with whom they might associate.

The facts here parallel those in *Anderson*. Because New York's petition deadline, like the deadline at issue in *Anderson*, discriminates against independent candidates and imposes a heavy burden on candidates and disaffected voters, the Court should apply strict scrutiny.

**B.   Asserted State Interests and Narrow Tailoring**

The second and third steps in the *Anderson* test require the Board of Elections to demonstrate that (1) that any asserted interests in upholding the constitutionality of the early filing deadline are compelling; and (2) that the early filing deadline is narrowly tailored to advance those interests. The Board's burden, moreover, cannot be met with mere conjecture. Although a defendant need not present "elaborate, empirical verification" of the weight of its purported verification when the burden is moderate, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997), it must come forward with compelling evidence when the burden is heavier, *see Buckley v. Am. Const. L. Fndn., Inc.*, 525 U.S. 182, 203-04 (1999); *Meyer v. Grant*, 486 U.S. 414, 425-28 (1988).

Although it remains to be seen what interests, if any, the Board will identify in support of the deadline, the State has no legitimate interest in "protect[ing] existing parties from competition ... generated by independent candidates who have previously been affiliated with the party." *Anderson*, 460 U.S. at 801-02. Indeed, "[c]ompetition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Id.* at 802 (quoting *Williams*, 393 U.S. at 32).

Here, New York's early filing deadline serves no obvious purpose other than to limit the competition faced by the major parties' nominees. As a result, the Court should find that the constitutional burdens outweigh any asserted state interest and that the plaintiffs are therefore highly likely to succeed on the merits of their claims.

## II. The plaintiffs will suffer irreparable harm in the absence of an injunction.

Harms that touch upon the constitutional and statutory rights of political parties, candidates, and voters are generally not compensable by money damages and are therefore considered irreparable. *See, e.g., Elrod v. Burns*, 427 U.S. 347 373 (1976) (plurality opinion); *League of*

13

*Women Voters v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986). Part of the reason for this treatment of political and voting harms is the special importance of the right to vote in the American democratic tradition:

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Reynolds v. Sims*, 377 U.S. 533, 561-62 (1962); *accord Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."). Money cannot fully compensate an individual for the loss of a right so fundamental. Part of the reason is also practical: a court simply cannot undo, by means of a special election or otherwise, all of the effects of an invalid election. Tremendous practical advantages accrue to those who win even tainted elections, and a court simply has no way to re-level the playing field.

In this case, the irreparable nature of the threatened injuries is obvious. Without an injunction, the Board of Elections will not print

Brown's name on the ballot, and his supporters—and anyone dissatisfied with the Democratic Party's nominee—will see no other candidates on the ballot when they go to vote.[2]

Under these circumstances, the plaintiffs will suffer actual, imminent, and irreparable harm in the absence of the requested relief.

### III. The balance of harms favors the plaintiffs.

The third *Winter* factor requires the Court to consider the potential impact that the requested injunction might have upon the Board of Elections, and to balance that potential with the considerable and irreparable harms that the plaintiffs would suffer should their request be denied. There is no question that the balance of equities tips in the plaintiffs' favor here.

The Board of Elections will suffer no harm if the injunction is granted. The deadline for determining the names that should appear on the ballot has not yet passed. The Board can simply prepare the ballots in due course with Brown's name if this Court so directs.

---

[2] The Supreme Court has made clear that the availability of a write-in candidacy "is not an adequate substitute for having the candidate's name appear on the printed ballot." *Anderson*, 460 U.S. at 799 n.26. *See also Lubin*, 415 U.S. at 719 n.5 ("The realities of the electoral process, however, suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot ….").

15

## IV. A preliminary injunction would serve the public interest.

The public interest in this case is clear. "[S]ecuring First Amendment Rights is in the public interest." *N.Y. Progress & Prot. PAC,* 733 F.3d at 488. *See also Hobby Lobby Stores, Inc. v. Sebelius,* 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) (quoting *Awad v. Ziriax,* 670 F.3d 1111, 1131–32 (10th Cir. 2012)) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."), *aff'd* 573 U.S. 682 (2014); *League of Women Voters of N.C.,* 769 F.3d at 247. The requested injunction will ensure that the citizens of Buffalo have a choice on the ballot. Without it, they will have but one choice. The public undoubtedly has a vital interest in a broad selection of candidates as well as the conduct of free, fair, and constitutional elections. *See Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006) (recognizing the public has a "strong interest in exercising the fundamental political right to vote" (citations omitted)). The requested injunction, if granted, would therefore favor the public interest.

Respectfully submitted this 30th day of August, 2021.

**/s/ Bryan L. Sells***
Georgia Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

*Application for admission pro hac vice forthcoming*

**/s/ Frank C. Callocchia**
Attorney for the Plaintiffs
Callocchia Law Firm, PLLC
16 Bidwell Parkway
Buffalo, New York 14222
Telephone: (716) 807-2686
Email: frank@callocchialaw.com