UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

**CARLANDRA D. MEADORS**, an individual,
**LEONARD A. MATARESE**, an individual, and
**JOMO D. AKONO**, an individual,

Plaintiffs,

vs.

**ERIE COUNTY BOARD OF ELECTIONS,**

Defendant.

<table>
<tr><td>

**MEMORANDUM OF LAW**
Civil Action Number:
21-CV-00982 (JLS)

</td></tr>
</table>

## PRELIMINARY STATEMENT

The essential facts of this matter are not in dispute. Byron Brown lost the Democratic primary for Mayor of the City of Buffalo to India Walton on June 22, 2021. Byron Brown was not nominated by any other party and had not filed an independent nominating petition by the statutory deadline of May 25th, therefore, his only chance at victory is a write-in campaign which he announced shortly after the primary. Indeed, that was and continues to be the public effort as "Write Down Byron Brown" signs have festooned lawns throughout the City.

On August 17, 2021, Byron Brown submitted to the Board of Elections what is being called an independent nominating petition seeking to add a new party to the November ballot, the "Buffalo Party," where he will be named as candidate for Mayor of the City of Buffalo. The Petition was in proper form and appeared to have sufficient signatures. However, the petition was filed long after the May 25th deadline set by law for such nominating petitions.

The Board of Elections rejected the petition as untimely at a hearing on August 27, 2021. At the hearing, counsel for Byron Brown as well as counsel for India Walton presented arguments. Counsel for Byron Brown argued that the Board of Elections could not invalidate the petition based on its untimeliness as that was outside the ministerial role of the Board. Counsel also argued the state statute that set the deadline as May 25th, which was enacted in 2019, was unconstitutional.

Counsel for India Walton, who defeated Byron Brown in the Democratic Primary and also objected to the untimely filed petition, argued that the unconstitutionality of a state statute is beyond the scope of the Board of Elections ministerial role, but the Board had to reject the petition because it was, on its face, not in compliance with state election law.

This lawsuit was commenced by three purported supporters of Byron Brown. The Court will note this action was commenced at exactly the same time Byron Brown commenced a state action seeking the exact same relief based on the exact same arguments. Both this matter and the state matter are scheduled for appearances on the same day.

## STANDARD FOR GRANTING A TEMPORARY RESTRAINING ORDER

Preliminary injunctive relief, including the temporary restraining order sought here, is an "extraordinary and drastic remedy" that is "unavailable except in extraordinary circumstances." Moore v. Consol. Edison Co., 409 F.3d 506, 511 (2d Cir. 2005). The "standards which govern consideration of an application for a temporary restraining order . . . are the same standards as those which govern a preliminary injunction." Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n, Inc., 965 F.2d 1224, 1228 (2d Cir. 1992).

When a temporary restraining order would "affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 143 (2d Cir. 2016) (citing Red Earth LLC v. U.S., 657 F.3d 138, 143 (2d Cir. 2011)). Since plaintiffs are seeking an injunction against the government that would change the status quo existing when the case was filed (by adding their candidate's name to the ballot), they are subject to a heightened standard. Murray v. Cuomo, 460 F. Supp. 3d 430, 442 (S.D.N.Y. 2020). Specifically, they must show "a 'clear' or 'substantial' likelihood of success on the merits." Thomas v. New York City Bd. Of Elections, 898 F. Supp. 2d 594, 597 (S.D.N.Y. 2012) (citing Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006)).

The heightened standard is necessary where, like here, the emergency injunctive relief "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." People ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015). The relief requested here "both mandates that the government take action (a mandatory injunction) and would result in Plaintiffs' receipt of [their] ultimate relief (i.e. [their candidate] appearing on the ballot) at the most preliminary stage of the case. Thus, the higher standard applies." Murray, 460 F. Supp. 3d at 443–43.

## New York Election Law Background

New York's election laws provide two ways for a candidate to secure a spot on the November ballot for the general election for local offices. Each is not mutually exclusive of the other.

*The primary election process.* As relevant to this action, party nominations of candidates for offices to be filled at a general election and, with certain exceptions, are made at the primary election. Election Law § 6-110. Currently, there are four constituted parties that may hold primaries; Democratic, Republican, Working Families, and Conservative. The candidate's formal participation in the electoral process is initiated by the filing of a designating petition signed by a requisite number of voters, depending upon the office being sought. Election Law §§ 6-132 and 6-134. In order to be placed on the ballot in the primary election for Mayor of Buffalo, a candidate must file a designating petition with 2,000 signatures of registered voters who belong to the respective political party. The designating petition must be witnessed and verified by a voter registered with the respective party, or, alternatively, by a notary public. If the candidate is unopposed, or is successful at the primary election, then their name appears on the general election ballot as the nominee of the political party. Generally, designation petitions must be filed by April.

The Court will note that Byron Brown participated successfully in this process. He successfully circulated a nominating petition for the Mayoral Democratic primary and his name appeared on ballot on June 22. This was his fifth time running the Mayoral Democratic primary.

*The independent candidate process.* A candidate may choose to elect to bypass the primary election process and instead seek direct access to the general election ballot, or could choose to seek direct access to the independent line and seek a party nomination at the same

-4-

time.  Independent candidates must file independent nomination petitions.  Election Law § 6-140.  Like the petitions used in the primary process, direct nomination petitions must be properly verified, and must be with a certificate of acceptance by the candidate.  Generally, independent nominating petitions must be filed by late May.  This year, the deadline for submitting those petitions was May 25th, 28 days before the primary and 7 weeks after the April 6th deadline for major party designating petitions.

Further this Court will note that New York State was sued by the federal government in 2012 related to the various dates established by the old political calendar.  (Docket No 1:10-cv-01214).  In order to comply with the Orders issued in that case various dates were moved by decree.  Ultimately, the entire calendar was moved in 2019 by legislative action.

## ARGUMENT

### PART I

### PLAINTIFFS DO NOT HAVE ARTICLE III STANDING TO BRING THIS CHALLENGE; THE ONLY INDIVIDUAL WHO HAS STANDING IS MAYOR BROWN.

This Court lacks jurisdiction to consider Plaintiffs' Complaint because Plaintiffs do not have Article III standing.

It is Plaintiffs' burden to prove that they have standing for each form of relief sought.  *See* Free Libertarian Party, Inc. v. Spano, 314 F. Supp. 3d 444, 450-51 (E.D.N.Y. 2018) (*citing* Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016); Marcavage v. City of New York, 689 F.3d 98, 103 (2d Cir. 2012)).

Because Plaintiffs are seeking injunctive relief at this very early stage of this litigation, they bear the full burden of proving that they have standing—mere allegations are insufficient.

The requirements for establishing standing are well-known:

> (1) the plaintiff must have suffered an injury in fact, *i.e.*, an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

National Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 688 (2d Cir. 2013) (*quoting* Lujan, 504 U.S. at 560-61); *see also* Free Libertarian Party, Inc. v. Spano, 314 F. Supp. 3d at 451.

In this case, the Plaintiffs are individuals who allegedly support a Mayor Brown and who allegedly signed an independent nominating petition for Mayor Brown to appear on the general election ballot.[1]  But, this mere fact does not create "a legally protected interest" that is "concrete and particularized" and is "actual and imminent." Indeed, the asserted constitutional rights—under the First and Fourteenth Amendments—are the rights of the ***candidate***, not the voters.  It is well-settled that only the individual possessing the constitutional right can assert that right in litigation; it cannot be asserted by a third party.  Plaintiffs have asserted their claims as a challenge "as applied here to the candidacy of Byron W. Brown for Mayor of the City of Buffalo." *See* Complaint, ¶27. It is Mayor Brown's candidacy and his rights under the First and Fourteenth Amendments—not Plaintiffs.

---

[1] Interestingly, none of the Plaintiffs have submitted any affidavit in support of their request for a temporary restraining order.

Undeniably, the case upon which Plaintiffs' arguments primarily rest, <u>Anderson v. Celebrezze</u>, 460 U.S. 780 (1983), was a challenge to the determination by the candidate—not a supporter of the candidate. That is the proper model for Plaintiffs' challenge and is directly relevant to standing. *See, e.g.*, <u>Davis v. N.Y. State Bd. of Elections</u>, 689 F. App'x 665, 668 (2d Cir. 2017) (candidate's challenge to Board of Elections' decision); <u>Van Allen v. Pataki</u>, 9 F. App'x 41, 42 (2d Cir. 2001) (holding that voters lacked standing to assert constitutional claim to restrict ability to sign independent nominating petition to non-enrolled registered voters); <u>Germalic v. Comm'rs State Bd. of Elections</u>, 2011 U.S. Dist. LEXIS 35729, at *5 (N.D.N.Y. Apr. 1, 2011) (holding that standing did not exist because of plaintiff's failure to identify any actual injury that he personally suffered as a result of Election Law requirement); <u>Signorelli v. N.Y. State Bd. of Elections</u>, 1995 U.S. Dist. LEXIS 13545, at *7 (N.D.N.Y. Sep. 8, 1995) (considering candidate's challenge to Election Law requirements, and holding that even candidate lacks standing if there is a failure to demonstrate injury).

There is only one proper party to assert this challenge: Mayor Brown. He is the only individual who has suffered an injury in fact, the only party whose constitutional rights are impacted, and he is the only person who can seek redressable relief from this Court. The Court should deny Plaintiffs' request for temporary restraining order because it lacks jurisdiction due to Plaintiffs' lack of Article III standing.

## PART II

### PLAINTIFFS' CLAIM IS BARRED BY THE DOCTRINE OF LACHES

Plaintiffs waited nearly 14 weeks after the § 6-158(9) deadline of May 25 and waited nearly two months after the results of the primary were known to commence the instant

proceeding to enjoin application of the state statute. With statutory deadlines to certify the ballot

(September 9th) and mail military ballots (September 17th) fast approaching, this was an

unreasonable and inexcusable delay that will prejudice Defendant's timely administration of the

election in accordance with statutory deadlines, thus, invoking the bar of laches. See New Era

Publ'ns Int'l, ApS v. Henry Holt & Co., 873 F.2d 576, 584 (2d Cir. 1989).

Elections are highly time-sensitive and courts must consider timing when evaluating the

drastic remedy of a temporary restraining order before an upcoming election. See Reynolds v.

Sims, 377 U.S. 533, 585 (1964) ("[U]nder certain circumstances, such as where an impending

election is imminent and a State's election machinery is already in progress, equitable

considerations might justify a court in withholding the granting of immediately effective relief . .

. ."). The risk of a court disrupting an election increases when a plaintiff improperly delays in

applying for injunctive relief. See Purcell v. Gonzalez, 549 U.S. 1, 4-5 (2006) ("Court orders

affecting elections, especially conflicting orders, can themselves result in voter confusion and

consequent incentive to remain away from the polls. As an election draws closer, that risk will

increase.").

In Murray v. Cuomo, 460 F. Supp. 3d 430, 449 (S.D.N.Y. 2020), for example, the court

considered a candidate's delay of almost two months after changes were made to New York

Election Laws in response to the COVID-19 pandemic before she sought a temporary restraining

order against designating petition requirements when it denied the candidate's application. Here,

the challenged statute has been in place for over two years, and Plaintiffs waited over three

months after the § 6-158(9) deadline passed before seeking this emergency relief to excuse their

candidate from compliance with state law. Laches may even apply when a plaintiff seeks a

temporary restraining order against petition requirements *before* nominating petitions are due.

Ariz. Libertarian Party v. Reagan, 189 F. Supp. 3d 920, 924 (D. Ariz. 2016) (denying a motion for a temporary restraining order filed more than two weeks before a deadline for nominating petitions).

Further, when a plaintiff offers no reasonable explanation for their delay in commencing an action with an imminent election and inadequate time to resolve factual and legal disputes, "courts will generally decline to grant an injunction to alter a State's established election procedures." Crookston v. Johnson, 841 F.3d 396, 398 (6th Cir. 2016) ("Call it what you will—laches, the Purcell principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.").

Here, the Brown campaign and Plaintiffs knew or should have known the lawful deadline for independent nominating petitions, but Plaintiffs have proffered no explanation for the delays in filing nominating petitions or commencing this proceeding. And before Plaintiffs make the claim that they are simply voters, inexperienced and uncertain of the intricacies of the election law, the Court will note that three Plaintiffs are so well versed in election law that they know the history of independent nominating petitions in New York going back to 1890. (See Verified Petition ¶¶ 11-17). Moreover, these same Plaintiffs are so well versed in independent nominating petition process that they knew the process was extended last year only because of COVID exceptions. (Verified Complaint ¶18). Therefore, by their own admission, these Plaintiffs knew exactly when the deadline was and what their remedies were. These three Plaintiffs could have filed their complaint on the day Byron Brown lost the primary.

In asking the Court to order Defendant to ignore a duly enacted state statute, Plaintiffs point to the *possibilities* that independent candidates or issues might emerge after a primary; however, the facts alleged in the Complaint state only that Brown's independent candidacy

followed his loss in the Democratic primary election. Comp. ¶¶ 21–23. Those facts lead only to the conclusion that Brown and his supporters had not contemplated losing the primary and simply want a second bite at the apple.

The Brown campaign and Plaintiffs' choices to proceed as if the New York Legislature had not enacted the 2019 Election Law amendments and to commence this proceeding at the eleventh hour will prejudice Defendant's ability to timely meet the requirements of administering the election. Perry v. Judd, 471 F. App'x 219, 226 (4th Cir. 2012) (holding that laches barred a candidate's attempt to enjoin enforcement of Virginia petition requirements when the candidate waited four months to bring a constitutional challenge and the delay would interfere with the ballot finalization, printing, and mailing process). "Ballots and elections do not magically materialize. They require planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed." Id. The public also potentially suffers prejudice, because Defendant "is charged with ensuring the uniformity, fairness, accuracy, and integrity" of elections in Erie County, which is an interest the Supreme Court has repeatedly credited. Id. at 227. Prejudice to the administration of justice may also be considered, like in Ariz. Libertarian Party, where the court denied a motion for a temporary restraining order that "left the Court with only 18 days before the petition-submission deadline to obtain briefing, hold a hearing, evaluate the relevant constitutional law, rule on Plaintiffs' motion, and advise the Secretary and the candidates which statutory petition requirement applies." 189 F. Supp. 3d at 924.

Accordingly, both prongs of unreasonable delay and prejudice are satisfied here, and the motion for a temporary restraining order should be dismissed on laches grounds.

**PART III**

## CLAIMS AGAINST THE ERIE COUNTY BOARD OF ELECTIONS ARE BARRED BY SOVEREIGN IMMUNITY

It is well settled that the Eleventh Amendment to the U.S. Constitution bars federal suits against a state and its agencies by one of its own citizens unless (i) the state unambiguously consents to be sued, or (ii) Congress has enacted legislation abrogating the state's Eleventh Amendment immunity. Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54-55 (1996); Papasan v. Allain, 478 U.S. 265, 276 (1986); Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100 (1984). Where "New York has not consented to be sued, and [] Congress has not enacted legislation abrogating New York's Eleventh Amendment immunity with regard to Plaintiffs' . . . causes of action, the claims against the [State Board] as a state agency are barred by sovereign immunity." Yang v. Kellner, No. 20 CIV. 3325 (AT), 2020 WL 2129597, at *6 (S.D.N.Y. May 5, 2020), *aff'd sub nom.* Yang v. Kosinski, 805 F. App'x 63 (2d Cir. 2020), and *aff'd sub nom.* Yang v. Kosinski, 960 F.3d 119 (2d Cir. 2020). So too here, the claims against the State Board are barred by sovereign immunity.

In this matter, the Ex parte Young exception does not apply because the only respondent in this case is the "Erie County Board of Elections," and no commissioners are named. Ex parte Young, 209 U.S. 123 (1908).

While it is the case that municipal governments do not enjoy sovereign immunity, states and state agencies do. Sovereign immunity under the Eleventh Amendment extends to state agencies that are "arms of the state." *See* Mancuso v NY Thruway Authority, 86 F3d 289, 292 (2d Cir 1996). New York's boards of elections are not a county agency. It is created by state law

-11-

and is more akin to a state entity or state authority than a municipal entity. *See* New York State

Election Law § 3-200 (1). Election Commissioners are largely independent of the normal county

government structures, and commissioners are answerable to the directives of the New York

State Board of Elections. *See* Election Law; 3-102 (1), (7). See <u>County of Nassau v State of</u>

<u>New York</u>, 100 AD3d 1052 (2nd Dept 2012) providing:

> However, the County cannot claim that, by complying with ERMA, it
> will be forced to violate a constitutional prohibition, because it is the
> NCBOE [Nassau County Board of Elections] — not the County — that is
> responsible for the implementation of the requirements of ERMA.
> Indeed, nowhere is it alleged in the petition/complaint that the County
> plays any role in the administration of ERMA or the selection of voting
> machines.[5] Rather, the petition/complaint specifically alleges that it is
> the NCBOE that "is responsible for carrying out the elections in Nassau
> County," which responsibility includes, among other things, "[s]electing
> new voting systems approved by the [SBOE] and ERMA." And, the
> Election Law confirms that it is the local board of elections that is
> charged with the selection and implementation of voting systems and
> machines (see Election Law §§ 3-226, 7-200 [1]; 7-208). **Notably, in this**
> **regard, the NCBOE does not act on behalf of the County, but is**
> **rather an independent political body separate and distinct from the**
> **County** (see Matter of Reynolds, 202 NY 430, 441 [1911]; *1056 Matter
> of Daly v Board of Elections of City of N.Y., 254 App Div 914, 914
> [1938], affd 279 NY 743 [1939]).

This Court should follow the holdings in <u>Tiraco v. New York State Bd. of Elections</u>, 963 F.

Supp. 2d 184 (Dist. Court, ED New York 2013); <u>McMillan v. New York State Board of</u>

<u>Elections</u>, (Dist. Court, ED New York 2012); <u>Murawski v. New York State Bd. of Elections</u>, 285

F. Supp. 3d 691 – (Dist. Court, SD New York 2018); <u>Credico v. New York State Bd. of</u>

<u>Elections</u>, 751 F. Supp. 2d 417 – (Dist. Court, ED New York 2010)(but allowed claims against

commissioners). As the District Court noted in <u>Credico</u>

> [T]he Board of Elections argues that plaintiffs' claims against it for
> declaratory and injunctive relief must be dismissed because it is entitled to
> sovereign immunity. I agree. The Eleventh Amendment bars a suit for

injunctive relief against a state agency unless Congress has clearly abrogated the state's immunity or the state has unequivocally waived its immunity. *See McMillan  v. New York State Board  of Elections,* 10   CV 2502(JG), 2010 WL    4065434,    at    *3    (E.D.N.Y.    Oct. 15, 2010) (citing *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). As Judge Gleeson recently determined in *McMillan,* the Board of Elections is a state agency for the purposes of the Eleventh    Amendment,    and    Congress    has    not    clearly abrogated New York's immunity  and New York has  not  unequivocally waived   it. *Id.* (citing *Iwachiw   v. New York City Bd.   of Elections,* 217 F.Supp.2d   374,   379   (E.D.N.Y.2002), *aff'd,* 126   Fed.Appx.   27 (2d Cir.2005)). Nevertheless, plaintiffs' request for prospective injunctive relief is available against the Commissioners acting in their official capacities under the *Ex  Parte  Young* doctrine. *See In  re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir.2007).

## PART IV

## THE COURT SHOULD DENY PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER UNTIL THE REQUIREMENTS OF FED. R. CIV. P. 5.1 HAVE BEEN MET.

Plaintiffs' failure to satisfy the requirements of FED. R. CIV. P. 5.1 compels the Court to reserve judgment on Plaintiffs' "as-applied" challenge to the constitutionality of N.Y. Election Law §6-158(9) until the New York Attorney General has had time to consider intervention in this action.  The Court's consideration of Plaintiffs' application for a temporary restraining order is premature and cannot proceed.

The requirements of FED. R. CIV. P. 5.1 are clear and well-known.  Under that rule, a party filing a pleading that calls

> into question the constitutionality of a federal or state statute must promptly: (1) file a notice of constitutional question stating the question and identifying the paper that raises it, if: ... (B) a state statute is questioned and the parties do not include the state, one of

-13-

its agencies, or one of its officers or employees in an official capacity.

FED. R. CIV. P. 5.1(a)(1)(B). Once that notice is filed by the party questioning the constitutionality of the applicable law (here, Plaintiff's challenge of New York State Election Law), it is the Court's duty to issue a certification to the appropriate attorney that New York law has been questioned. *See* FED. R. CIV. P. 5.1(b) (citing 28 U.S.C. §2403).

On September 1, Plaintiff has filed notice that the Attorney General has been served, less than 48 hours before the hearing on this TRO is scheduled.

Once the claimants' notice is served and the Court issues the foregoing certification, the New York Attorney General has up to 60 days to decide whether to intervene in the action. *See* FED. R. CIV. P. 5.1(c). Under this rule, the Court is allowed to set a later time than 60 days but lacks the authority to set a shorter time for intervention by the attorney general. Id. Most importantly, Rule 5.1(c) is incredibly clear that, before the attorney general's time to intervene has expired, the Court may reject the constitutional challenge but may **not** enter a final judgment holding the statute unconstitutional. FED. R. CIV. P. 5.1(c).

In this case, Plaintiffs have asserted a single claim—an "as-applied" challenge to the constitutionality of N.Y. Election Law §6-158(9). *See* Complaint [Docket #1, filed August 30, 2021], ¶¶1, 27. It is beyond quibble that Plaintiffs have asserted that this provision of New York's election law is unconstitutional. Id.

Despite Plaintiffs' single claim for relief, Plaintiffs have failed to satisfy the requirements of FED. R. CIV. P. 5.1 in any respect. First, Plaintiffs have not satisfied Rule 5.1(a) because they have not filed a "notice of constitutional question" with this Court. And while the service has now been completed it was completed less than 48 hours before the hearing, obviously giving no

time to the New York State Attorney General to make a competent decision, let alone mount a defense. Because of Plaintiffs' failures, the Court has not had the opportunity to certify the existence of this question to the New York Attorney General, as required by FED. R. CIV. P. 5.1(b).

Because the State has not been advised that its law is allegedly unconstitutional, this Court should not render any judgment or grant any relief regarding Plaintiffs' constitutional challenge. It is clear that the State must be given notice of this challenge and an opportunity to defend the constitutionality of its statute in a timely manner and before any relief can be granted.

To do otherwise, would severely prejudice the state, as well as those who have abided by the existing statute, in particular candidates who are on the November ballot, their supporters and the voters. And there can be no mistake, this prejudice is intended by the Plaintiffs. By commencing this action against the Board and not any state agency, the Plaintiffs avoided tangling with the Attorney Generals office that has the expertise and resources to defend a state statute. In all honesty, the County Attorneys office has never been put in the position of having to defend the constitutionality of a state statute. That was all by design and likely because the arguments on the merits are not particularly strong. Plaintiffs should not be unfairly rewarded by cleverly avoiding the Attorney General's office.

In <u>SRE Real Estate, Ltd. Liab. Co. v. City of Sturgis</u>, 2010 U.S. Dist. LEXIS 81061 (D.S.D. Aug. 9, 2010), the Court considered a constitutional challenge to zoning regulations imposed by the State of South Dakota and the City of Sturgis, S.D. <u>Id.</u> at *1-2. Shortly after filing the Complaint in Federal Court, plaintiffs sought a temporary restraining order or preliminary injunction regarding the challenged regulations. <u>Id.</u> at ¶¶1-2. However, neither the State of South Dakota nor any state employee or officer was named as a party to the action. <u>Id.</u> at ¶8. Additionally, there was no proof in the docket that plaintiffs had complied with FED. R. CIV. P.

5.1(a) (or with South Dakota's state law requiring notice of any constitutional challenge to state law). Id. at ¶9.

Because of the plaintiffs' failure to satisfy FED. R. CIV. P. 5.1, the Court was unable to "address the merits of plaintiffs' claims without allowing the Attorney General for the State of South Dakota the opportunity to intervene." Id. at ¶10. The Court further reasoned: "[b]ecause the court is precluded from evaluating plaintiffs' constitutional challenges to the regulations, the court cannot determine whether plaintiffs will suffer irreparable harm by the enforcement of the regulations." Id. at ¶11. Relying on "the public interest," the Court concluded that "[t]he public would not be served by a hasty decision casting into doubt the validity of the regulations." Id. at ¶12. Furthermore, the Court stated: "[t]o issue injunctive relief without input from the Attorney General and without carefully and fully considering the issues at bar would be rash and not in the public's best interest." Id.

Accordingly, the Court denied the motion for a temporary restraining order or preliminary injunction without prejudice, making clear that the Court had taken "no position on the merits of plaintiffs' claims," and that the plaintiffs could refile their application for a temporary restraining order or preliminary injunction "once the Attorney General has had the opportunity to intervene." Id. at ¶13. *See also* Disability Rights Ohio v. Buckeye Ranch, Inc., 375 F. Supp. 3d 873, 884 n.3 (S.D. Ohio 2019) (declining to consider claim that law violated Fifth Amendment to U.S. Constitution because requirements of FED. R. CIV. P. 5.1 had not been satisfied).

In Hunter v. Hamilton Co. Bd. of Elections, 850 F. Supp. 2d 795 (S.D. Ohio 2012), the Court faced due process challenges under the U.S. Constitution to Ohio election law procedures concerning the counting of provisional ballots cast in the wrong precinct due to poll-worker error and to the State's failure to adequately supervise poll workers. 850 F. Supp. 2d at 841-42. The

Court's analysis revealed that Plaintiffs were, in fact, asserting a constitutional challenge, even though Plaintiffs argued that it was not a constitutional challenge.

The Court's conclusion as to these challenges was clear, compelling, and instructive:

> [u]ltimately, Plaintiffs' due-process challenge calls into question the constitutionality of Ohio's statutory scheme and is not limited to the Board's application of Ohio law in the November 2010 election. Because the Court cannot rule on this claim without passing upon the constitutionality of Ohio election laws, the Court is bound by the language of Rule 5.1 and is disinclined to rule upon the issue in the absence of the Ohio Attorney General.

Id. at 844. Because of the claimant's failure to provide required notice to the State of Ohio under FED. R. CIV. P. 5.1, the Court declined to rule on the constitutional challenge.

A similar conclusion is required here. Plaintiffs' case is obviously related to a single issue—the constitutionality of N.Y. Election Law §6-158(9). Plaintiffs' Complaint makes this fact clear in its first sentences: "This is an as-applied constitutional challenge to New York's petition deadline for independent candidates." See Complaint [Docket #1, filed August 30, 2021], ¶1. A review of the Court's Docket reveals that Plaintiffs have not filed a "notice of constitutional question" with the Court, and there is no evidence that such a notice was served on the New York Attorney General. Relatedly, the Court's Docket demonstrates that the Court has not issued any certification under Rule 5.1(b), and that such a certification has not been served on the New York Attorney General.

This Court cannot render judgment on Plaintiffs' application for a temporary restraining order without analyzing the constitutionality of N.Y. Election Law §6-158(9)—indeed, considering Plaintiffs' likelihood of success on the merits of this case mandates such scrutiny. It would be improper for this Court to consider the constitutionality of this state law and to assess Plaintiff's likelihood of success on the merits without inviting the New York Attorney General to

intervene in this action. *See* <u>SRE Real Estate</u>, 2010 U.S. Dist. LEXIS 81061, at ¶¶10-13; <u>Hunter</u>, 850 F. Supp. 2d at 844. Similarly, as discussed in <u>SRE Real Estate</u>, assessing a party's alleged irreparable harm without allowing the New York Attorney General to intervene is inconsistent with FED. R. CIV. P. 5.1. *See* <u>SRE Real Estate</u>, 2010 U.S. Dist. LEXIS 81061, at ¶¶10-11.

Accordingly, Defendant requests that this Court reject Plaintiffs' application for a temporary restraining order, without prejudice, until such time as Plaintiffs have satisfied the requirements of FED. R. CIV. P. 5.1.

## PART V

## IS SECTION 6-158(9) VIOLATIVE OF THE UNITED STATES CONSTITUTION?

Plaintiffs are asking this Court to grant a temporary restraining order and, to do that, must demonstrate a substantial likelihood of success on the merits. That high bar cannot be met here. At best for the Plaintiffs, it is a close call where different Judges and different courts may approach the issue in the same manner and arrive at different results. That is not the type of situation that allows for a TRO.

Before analyzing the complex nature of the law in this area, this Court should recognize that hundreds of candidates supported by thousands of voters have successfully filed independent nominating petitions across New York State since the new law went into effect in 2019. In fact, in Erie County just during this year, several candidates will appear on independent nominating lines in the general election. These include John Garcia running for Sheriff on the Back the Blue party line, Ted Dinoto running for Sheriff on the Public Service party line, as well as a whole slate of Republican candidates in Amherst running on the United for Amherst party ticket. Thus, even before exploring the complexities of constitutional law in this area, this Court must

recognize that ballot access does not seem to be hampered in New York State. Just because Plaintiffs chose not to pursue an independent nominating petition, and then changed his mind in late August, does not mean his constitutional rights were infringed upon.

### A. Applicable Standard to Analyze State Election Law

The case Plaintiffs principally rely upon, sets out a standard for this matter that can charitably be called vague:

> Our ballot access cases … focuses on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the "availability of political opportunity."

Anderson v. Celebrezze, 460 US 780, 793 (1983)(quoting Clements v. Fashing, 457 US (1982).

Perhaps recognizing the vague nature of this standard, the Court elaborated the standard in Burdick v. Takushi, 504 US 428, (1992) and explained that the severity of the burden imposed by a particular election law, or series of laws, dictates the level of scrutiny applied by the court. "The Court held that an election regulation that imposes a severe burden is subject to strict scrutiny and will be upheld only if it is narrowly tailored to serve a compelling state interest." Nader v. Brewer, 531 F3d 1028, 1034 (9th Cir. 2008).

Thus, Plaintiffs and Defendant are in agreement: if a ballot access statue is severely burdensome or discriminatory the state must show a compelling interest and a narrowly tailored law.

That said, the United States Supreme Court also recognizes

> "as a practical matter there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than the chaos, is to accompany the democratic processes." To achieve these necessary objectives, States have enacted a comprehensive and sometimes complex

election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably effects – at least to some degree – the individual's right to vote and his right to associate with others for political ends. Nevertheless, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

Anderson, at 1570(quoting Storer v. Brown, 415 US 724).

Plaintiffs argue that the deadline imposed by New York State is severe, but that just is not born out by the facts. The Court will note that the deadline imposed by New York State law did not prevent Byron Brown from circulating an independent nominating petition. Indeed, Byron Brown was able to circulate a petition in March in order to qualify for the Democratic Primary. Moreover, Byron Brown knew, or it can be presumed that he knew, that if he lost the Democratic Party primary he would not appear on the ballot in November. The same is true for these Plaintiffs who follow politics so closely they area ware of an assembly race in New York City from 2020. (See Verified Complaint ¶ 18). Thus, Plaintiffs conclusion that the May 25th deadline is "severe" is nothing more than a self-serving statement.

There are numerous cases concluding that the lower standard is applicable to reasonable deadlines. See, e.g. Swanson v. Worley, 490 F.3d 894, 905–06, 910 (11th Cir.2007) (upholding Alabama's primary-day filing deadline, in combination with a three percent signature requirement, for unaffiliated candidates in local and statewide elections); Lawrence v. Blackwell, 430 F.3d 368, 370, 375 (6th Cir.2005) (upholding Ohio's primary-eve *filing* deadline for unaffiliated congressional candidates, in combination with a one percent signature requirement); Wood, 207 F.3d at 713–14, 717 (upholding Virginia's primary-day filing deadline, in combination with a 0.5% signature requirement, for unaffiliated candidates in local and statewide elections).

This Court should not apply strict scrutiny to the statute at issue. Instead the Court

should employ the balancing test articulated by the Anderson court. Where, as here, the burden

is insignificant, reasonable, and non-discriminatory, the regulation should be upheld. The

Second Circuit articulated the appropriate standard well

> If the plaintiffs' rights are severely burdened, the statute is subject
> to strict scrutiny. Burdick, 504 U.S. at 435, 112 S.Ct. 2059. If the
> burden is minor, but non-trivial, Burdick's balancing test is
> applied. Under this balancing test, the State's reasonable and
> nondiscriminatory restrictions will generally be sufficient to
> uphold the statute if they serve important state interests. Id. Review
> in such circumstances will be quite deferential, and we will not
> require "elaborate, empirical verification of the weightiness of the
> State's asserted justifications." Timmons, 520 U.S. at 364, 117
> S.Ct. 1364. Nonetheless, … *where the burden imposed by the law
> is non-trivial, we must weigh the State's justification against the
> burden imposed. See Burdick*, 504 U.S. at 439, 112 S.Ct. 2059; *see
> also Timmons*, 520 U.S. at 364, 117 S.Ct. 1364.

Price v New York State Bd. of Elections, 540 F3d 101, 109 [2d Cir 2008](emphasis added).


## B. Deadlines for Independent Nominating Petitions

Plaintiffs claim the holding from Anderson v. Celebrezze, 460 US 780 (1983), dictates

the conclusion that New York State's deadline of May 25th (24 to 23 weeks prior to the General

Election yet only 28 days before the primary) for independent nominating petitions is violative of

the constitution. However, Anderson cannot be reduced to simple rule that is applicable in any

other context. The United States Supreme Court did hold that the Ohio law governing ballot

access for a Presidential Candidate was unconstitutional, but it did not, under any honest

interpretation of the decision, hold that an early petitioning deadline is on its own a *per se*

violation. In fact, the Court very specifically held that there is no "litmus-paper test" and that

courts must resolve constitutional challenges to state election laws "by an analytical process that parallels its work in ordinary litigation.... The result of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made." Id. at 789 (quoting Storer v. Brown, 415 US 724 (1974). The Court is warning us, and warning this Court, not to look for a simple bright-line rule that can be applied across the board in what is a complicated area of the law that is fact specific. (This holistic analysis was also expressly employed in Williams v. Rhodes, 393 U.S. 23, 34 (1968); Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd., 844 F.2d 740, 741 (10th Cir.1988).)

Thus, the entire premise of Plaintiff's legal argument is based on an over simplification of the Anderson decision. The Court was not evaluating an early dead line in a vacuum, it analyzed Ohio's March 20th deadline in the context of the entire ballot access structure contained within the Ohio law as well as the purported rationale for each of the various provisions at issue as well as the nature of who the Plaintiffs were. This explains why the Court referred to Storer v. Brown, 415 US 724 (1974), a case that reached a different conclusion and upheld state election laws restricting access by independent candidates, without overturning Storer. "Thus in Storer we recognized the legitimacy of the State's interest in preventing "splintered parties and unrestrained factionalism... Instead in Storer we examined the two challenged provisions in the context of California's electoral system." Anderson at 803.

Anderson is the very beginning of the analysis and beyond providing very broad principles that have been recognized for decades, it cannot serve as a blue print for this case, or any case. The Court, within its own decision, warned against that simplified approach, the very approach Plaintiffs demand of this Court.

Following the written decision of Anderson, (all of it, not just the portions that support a particular position), the distinctions between the Ohio statute and the statute at issue in this case prevents Anderson from being binding precedent. So, for example, the deadline under the Ohio statute was March 20th while the deadline at issue here is May 25th. Further, as the Court noted, the early deadline for independent nominating petitions in Ohio was inequitable when compared to major party candidates. "At this point [March 20th] developments in the campaigns for the major party nominations have only begun, and the major parties will not adopt their nominees and platforms for another five months." Id. at 791 (emphasis added).

In New York State, the deadline to submit an independent nominating petition is after the deadline for the established parties. In addition to these critically important differences in the statutes at question, the Court in Anderson was particularly interested in the fact that the Plaintiff was a Presidential candidate. This is not to suggest that the holding in Anderson is only applicable to Presidential elections, but any reading of the decision reveals a very careful analysis in the context of the only national campaign this country holds. That careful analysis is inapplicable in this case as the Anderson court explicitly stated "[t]he state's interest in regulating a nationwide Presidential election is not nearly as strong; no State could singlehandedly assure "political stability" in the Presidential context." Id at 804.

Plaintiffs then turns to three other Circuit Court cases that rely on Anderson. Again, neither of the three cases supply a bright line rule for this Court to apply in this case. And, again, the Court's analysis was driven by a complicated set of facts and the interplay between a complicated set of state statutes as well as the nature of the Plaintiffs and how they were severely burdened.

-23-

In <u>Nader v. Brewer,</u> supra, the 9th Circuit grappled with Arizona access laws for a

Presidential candidates. The Court dealt with both the laws regarding petitioning as well as the

deadline for independent nominating petitions. In Arizona, at that time, the legislature had

changed the deadline "from 10 days after the primary election to 75 days before the primary

election." <u>Id.</u> at 1038. The Court noted that since the change in law that took effect in 1993 "no

independent Presidential candidate has appeared on the Arizona's ballot." <u>Id.</u> at 1038. This last

point is critical. The Court had roughly 11 years of evidence that demonstrated the restrictive

nature of Arizona's laws.

Here, there is no evidence of any deleterious impact on independent nominating petitions

since the 2019 went into effect. Indeed, here in Erie County alone, multiple candidates have

circulated and qualified independent nominating petitions and will appear on the November

Ballot.

Also, buried in the <u>Nader</u> decision is a comment the court made in order to distinguish

the Arizona law from another ballot access that the same court had upheld in <u>Libertarian Party of

Washington v. Munro</u>, 31 F.3d 759 (9th Cir. 1994). In distinguishing <u>Libertarian Party</u>, the court

wrote

> There we upheld a Washington statute requiring minor party candidates to obtain
> 200 signatures for statewide offices or 25 signatures for other offices by July 4 of
> the election year. The case thus involved a comparatively small number of
> signatures and a date closer to the major parties' convention. For those reasons we
> concluded that only a de minimus burden was imposed. We explained why the
> restrictions were much less burdensome than those in <u>Anderson</u>. We pointed out
> that collecting such a small number of signatures <u>just four to five weeks before the
> selection of major-party candidates was not particularly difficult.</u>

<u>Nader</u>, at 1039. If Defendant were to employ the same oversimplified analysis Plaintiffs is

relying on, it would be argued that the <u>Nader</u> court held, unequivocally, that a deadline five

-24-

weeks before the primary was not particularly difficult and, therefore, constitutional. That would then mean New York's law is constitutional. Of course, that is an oversimplification. The Court should be guided by <u>Nader</u> and <u>Anderson,</u> but must reach an independent conclusion based on the facts in this record and the complexity of New York's election access statutes. As the <u>Nader</u> court concluded, "election cases are difficult." <u>Id.</u>

Turning then to another case relied on by Plaintiffs, <u>Council of Alternative Political Parties v. Hooks</u>, 121 F3d 876 (3rd Cir. 1997), the early deadline for independent nominating petitions was 54 days prior to primary, or April 10. Again, there is no bright line rule for this Court to follow. But, all three cases relied on by Plaintiffs have a far earlier deadline than does New York State.

What is particularly noteworthy about <u>Council of Alternative Political Parties</u>, is that the Third Circuit delved into the same issue two years later at the end stage of the litigation. The Plaintiffs fails to cite <u>Council of Alternative Political Parties v. Hooks</u>, 179 F.3d 64 (3rd Cir. 1999), and a review of that case makes it clear why. The Court expressly rejected the very same remedy, the Plaintiffs here seeks.

> Therefore, what the plaintiffs wish to enjoy on a permanent basis – and what they obtained in 1998 under an interim consent order – is a petition deadline that is substantially later than the date of the primary, when the major party candidates are nominated. (In 1998, their deadline was July 27.) Accordingly, what they are seeking cannot be termed equal treatment. On the contrary, they are asserting a constitutional right to preferential treatment.

So, while the Court had granted a preliminary injunction two years earlier, when the Plaintiffs attempted to create a permanent change in the law benefitting their independent nominating candidacies, the court expressly rejected their request. These Plaintiffs are asking this Court to

grant them the relief the court characterized as preferential treatment. These Plaintiffs are not

seeking a level playing field on behalf of all candidates, they want this Court to place their

interests above other voters who do not support Byron Brown and receive preferential treatment

from this Court, impermissible preferential treatment.

The other case cited by Plaintiffs that relied upon <u>Anderson</u> is <u>Cromer v. State of Couth

Carolina</u>, 917 F2d 819 (4th Cir 1997) and in that case the deadline was 70 days before the

primary. Interestingly, this court drew distinctions between the type of candidates that were

impacted by the deadline. The Court noted "[a]s we later note, and as the *Hechler* court also

pointed out, harsher restrictions may be imposed by a state upon third party candidacies than

upon independent candidacies because of the different state interests involved." <u>Id</u> at 822. The

court also stated "[t]he primary concern in assessing this or any restriction on ballot access by

candidates is not the interest of the candidate but of the voters who support the candidate and the

views espoused by the candidate." <u>Id</u>. This goes to the nature and type of candidate (or in this

case, candidate's supporters) involved. As discussed below, Byron Brown is neither an

independent candidate nor is he a third-party candidate. He is not offering anything unique to

the community political discussion and he is not offering a new political ideology. He is a fourth

term incumbent who expected to win and didn't. This should guide this Court's analysis just as

the court noted in <u>Cromer</u>.

Finally, this Court should be aware that while Plaintiffs focuses on these cases, there are

numerous cases where the court has upheld various restrictions on every aspect of the election

process. For example, the Court has upheld regulations prohibiting write-in voting, <u>Burdick v.

Takushi</u>, 504 U.S. 428 (1992); mandating that voters register to vote fifty days before an

election, <u>Marston v. Lewis</u>, 410 U.S. 679 (1973); omitting pretrial inmates, still eligible to vote,

from the list of people who could receive absentee ballots, <u>McDonald v. Bd. of Elections Comm'rs of Chicago</u>, 394 U.S. 802 (1969); and requiring all in-person voters to present government-issued identification, <u>Crawford v. Marion Cnty. Election Bd.</u>, 553 U.S. 181 (2008).

Burdick is particularly noteworthy for this proceeding. In *Burdick v. Takushi*, the Court reviewed a Hawaii election statute that required all candidates to file nominating petitions by the same deadline and eliminated write-in voting all together. The Burdick Court concluded that Hawaii's statute prohibiting write-in ballots passed this constitutional test because it burdened only "the interest the candidate and supporters may have in making a later rather than early decision to seek independent ballot status," an interest to which the Court assigned "little weight." <u>Id</u>. at 437. The Court explained that Hawaii had three mechanisms by which candidates could appear on the ballot, all of which required filing nominating petitions 60 days before the primary. 504 U.S. at 435-36. That is, under Hawaii's regulations, all candidates must file petitions by the same deadline. The Court stated that Hawaii's system "provides for easy access to the ballot until the cutoff date for the filing of nominating petitions, two months before the primary." *Id.* at 436. "Consequently, any burden on voters' freedom of choice and association is borne only by those who fail to identify their candidate of choice until days before the primary." *Id.* at 436-37 (citing Storer, 415 U.S. at 736). The Court concluded that any burden imposed by Hawaii's write-in vote prohibition was a very limited one. <u>Id</u>.

The Supreme Court's reasoning in <u>Burdick</u> confirms that New York's requirement that independent candidates file nominating petitions prior to the primary election, but after party designating petitions are due, imposes only a very limited burden. An earlier Supreme Court decision, <u>Jenness v. Forton</u>, 403 U.S. 431, 433-34 (1971), also supports the constitutionality of New York's filing deadline. The Georgia law challenged in <u>Jenness</u> required independent

candidates to meet the same filing deadline as party candidates, *i.e.,* the second Wednesday in June. The Supreme Court held that this filing date "does not fix an unreasonably early deadline for candidates not endorsed by established parties." Id. at 438.

### C. "Sore Loser" Statutes are Upheld and
### Preventing Sore Loser Candidacies is a Legitimate State Interest

Before assessing New York's deadline for independent nominating petitions, the Court must also recognize that Byron Brown is a "sore loser" as that term is defined in applicable case law. This becomes significant as this Court weighs the interests between protecting alleged constitutional rights of a sore loser and his supporters and upending the entire New York State election calendar one week before ballots need to be certified.

A "sore loser" candidacy is one in which an individual loses in a party primary and then seeks to run in the same election as an independent or minor party candidate. Council of Alternative Pol. Parties v. Hooks, 179 F.3d 64, 80 (3d Cir. 1999).

The US Supreme Court has recognized the validity of a state's interest to limit names on the general election ballot in order prevent party primary losers from continuing the struggle into the general.

> The general election ballot is reserved for major struggles; it is not a forum for continuing intraparty feuds. The provision against defeated primary candidates running as independents effectuates this aim, the visible result being to prevent the losers from continuing the struggle and to limit the names on the ballot to those who have won the primaries and those independents who have properly qualified.

Storer v. Brown, 415 U.S. 724, 735, (1974). Indeed, a "State may impose restrictions which settle intraparty competition before the general election." Nat'l Comm. of U.S. Taxpayers Party v. Garza, 924 F. Supp. 71, 74 (W.D. Tex. 1996). "The Supreme Court recognized,

in Clingman, that preventing sore-loser candidacies serves an important state interest in preventing "party splintering and excessive factionalism," as well as "the organized switching of blocs of voters from one party to another." Libertarian Party of Michigan v. Johnson, 905 F. Supp. 2d 751, 760 (E.D. Mich. 2012), aff'd, 714 F.3d 929 (6th Cir. 2013).

Even in Anderson, the court accepted the rationale of "sore loser" statutes. In Ohio, there was a statute that prohibited defeated major party candidates from seeking independent party nominations and it is clear from the decision that the state had a compelling state interest in preventing sore losers from seeking alternative means of maintaining their campaign. The difference is in New York there is no such prohibition. Rather, in order to prevent sore losers like Byron Brown from creating political instability and creating a mirage of political independence only after a primary loss, New York simply places the petition period just prior to primary day.

This Court would be well advised to read the dissent in Anderson, filed by Justices Rehnquist, White, Powell and O'Connor. Justice Rehnquist predicted what could result from a future application of the Anderson decision:

> The Court's opinion protects this particular kind of candidate – an individual who decides well in advance to become a Presidential candidate, decides which route to follow in seeking a position on the general election ballot, and, after seeing his hopes turn to ashes, wants to try another route. The Court's opinion draws no line; I presume that a State must wait until all party nominees are chosen and then allow all unsuccessful party candidates to refight their party battles by forming an "independent" candidacy. I find nothing in the Constitution which requires this result.

Id. at 823. Justice's Rehnquist biting sarcasm was well placed, as Byron Brown is exactly the type of candidate he is warning against and predicting from nearly forty years ago.

### D.  The Election law in question promotes various compelling state interests

New York's deadline for independent nominating petitions promotes several important state interests, any one of which provides an adequate basis to uphold the statute. See FCC v. Beach Commc'ns, 508 U.S. 307, 313 (1993) (court may look to any conceivable interest). The State's asserted interests, which was outlined in a letter from the State Board of Elections to the Governor's office prior to this legislation being signed, include: encouraging political stability, promoting a fair electoral process, ensuring an informed electorate and administrative need.

*Political Stability*

The May filing deadline for independent nominating petitions prevents "sore loser" candidacies in which an individual loses in a party primary, but then chooses to seek to run in the same election as an independent candidate.

Conversely, the late May deadline protects independent nominations to some extent from party candidate incursions by which a party candidate simply seeks an extra ballot line, because independent petitioning overlaps slightly with designating petitioning and the independent petitions are filed before the primary.  The calendar thus encourages independent nominations to be about independent ballot access and not about party candidate sore losers getting on the ballot or party candidate seeking an extra ballot position.

These established state interests in regulation of elections are, as a matter of law, sufficient to justify New York's filing deadline. Burdick, 504 U.S. at 440; see also Timmons, 520 U.S. at 358 (minimal burden shown by Plaintiff results in less exacting scrutiny of state interests in passing law).

-30-

**E. Application of the Above Constitutional Analysis to the Facts Presented Here**

Byron Brown is a "sore loser" as that term has been used in federal courts. He lost a major party primary and now wants to challenge the winner of that primary in November. His status as a "sore loser" should give this Court immediate pause before granting the relief sought herein. Nor should the fact that this action is being pursued on behalf of his supporters rather than the candidate himself. There is no discernible distinction in the case law that affords voters more constitutional rights than the candidates they support. All of the Courts that have discussed "sore loser" statutes, or the rationale for preventing sore loser candidacies, recognized that a state has a compelling state interest in preventing sore loser candidacies.

It also cannot seriously be suggested that Byron Brown was prevented from circulating an independent nominating petition by anything other than his own hubris. Byron Brown has been elected official since the 90's and successfully ran in the Mayoral Democratic primary four times. In each of those times, the deadline for submitting an independent nominating petition was before the primary. Indeed, Byron Brown has never run in an election in New York State where the deadline to submit those petitions was after the primary. Therefore, it is a reasonable assumption that Byron Brown knew the consequence of losing the primary and he knew the consequence of losing the primary in April of this year, when all party nominating petitions were filed. The same can be said of these Plaintiffs as well, who have an in-depth knowledge New York State's election law.

Nor can it be said that this effort by Byron Brown is some type of grassroots effort organically responding to disappointment in major party nominees. This effort, as shown in local published media reports, is almost entirely made of up city hall employees and some active

-31-

Republicans. These are not the disaffected voters espousing a fringe or unpopular political ideology as the Plaintiffs were in <u>Anderson, Nader</u>, etc. This is a group of savvy political operatives who were not savvy enough to win a Democratic primary but have the chutzpah to challenge a state statute that everyone else in New York State has abided by for two years.

These are not just disparaging comments of this effort for the sake of making disparaging comments. Undergirding the rational for the above referenced cases, particularly those relied upon by Plaintiffs, is the idea that major parties stifle competition and when a state statute unfairly disadvantages those not affiliated with any major party, there are constitutional implications. In <u>Anderson,</u> supra, and in <u>Nader,</u> supra, the Court was dealing with Presidential Candidates challenging the two-party system and being boxed out by onerous petition deadlines. In <u>Council of Alternative Parties</u>, supra, the Plaintiffs was a loose affiliation between the Green Party, the Natural Law Party, the Conservative Party, the Libertarian Party and the US Taxpayers Party. In other words, it was a legitimate group of disaffected candidates and their supporters. That is just not what we have here. Byron Brown is a sore loser and such he is not entitled to the same considerations the Courts have given to actual third-party candidates.

Even setting aside who the Plaintiffs are in this matter, the Court should not be persuaded by the over simplified arguments presented. There is no simple rule that dictates an independent nominating petition must be a certain amount of days before the general election. Indeed, there is not even a hard and fast rule that dictates if an independent nominating petition should fall before or after primaries, and different states structure their calendar differently. (After some research it appears that approximately 14 states schedule the deadline for independent nominating petitions before the primary). This Court must decide that, in the context of the entire New York State election law, is four to five weeks prior to the primary, and six weeks

after major parties have to circulate their own nominating petition, severely burdensome. As argued above, the May 25th deadline cannot be considered severely burdensome or even slightly burdensome. (The legislature has to pick a date on the calendar and any date they pick is burdensome to the person who blows that deadline). However, even if this court finds some level of burden imposed by the statute, the statute survives if there is a state compelling interest that justifies that and the law is narrowly tailored to meet that objective. Plaintiffs would like this Court to read a few portions of Anderson, out of context, and ignore all of the courts that have upheld various deadlines in an election law calendar, and then conclude that Byron Brown and his supporters have been somehow treated unfairly. The above careful analysis demonstrates how and why that approach should be rejected by this Court. Defendant requests an Order from this Court that denies the application for the TRO. This will enable Byron Brown and his supporters to continue to "Write Down Byron Brown" campaign that they have been waging since Brown lost the primary.

DATED:    Buffalo, New York
              September 2, 2021

Yours truly,

MICHAEL A. SIRAGUSA
Erie County Attorney and
Attorney for the Defendant


By:   s/Jeremy C. Toth
Jeremy C. Toth, Esq.
First Assistant County Attorney
95 Franklin Street, Room 1634
Buffalo, NY 14202
716-858-2208