## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Carlanda D. Meadors, et al., ) | |
| ) | |
| Plaintiffs, ) | Case No. 21-cv-982-JLS |
| ) | |
| v. ) | |
| ) | |
| Erie County Board of Elections, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ..................................................................... 1

II.    STATUTORY BACKGROUND ..................................................................... 3

    A.    There are two ways for candidates to appear on a ballot. ...................... 3

    B.    The Legislature alters the calendar in 2019. .......................................... 4

III.    THIS CASE AND RELATED PROCEEDINGS ................................................. 7

    A.    Earlier proceedings in this Court and state court. ................................. 7

    B.    The Second Sircuit stays this Court's injunction, and the Fourth
Department also reverses. ........................................................................ 9

    C.    Developments since the Second Circuit's stay. ..................................... 10

IV.    ARGUMENT ........................................................................................... 10

    A.    There is no evidence to illustrate how New York's petition
deadline burdened Plaintiffs. ................................................................ 11

        1.    Plaintiffs have the double burden to overcome the
presumption of constitutionality and produce evidence to
make their case .......................................................................... 11

        2.    There are neither allegations nor evidence of any burden
on Plaintiffs, and so no dispute of material fact. ...................... 12

    B.    The State's interests in regulating elections outweigh Plaintiffs'
interest in getting a second bite at the apple. ...................................... 16

        1.    States are permitted to bar sore loser candidates from
appearing on the ballot. ........................................................... 16

        2.    Several other state interests support the deadline as
applied here. .............................................................................. 18

        3.    The facts in *Anderson* were very different from here. ................ 22

V.    CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ........................................................................ 11

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .................................................... 13, 18, 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 12

*Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U. S. 320 (2006) ............. 11

*Brown v. Erie Cnty. Bd. of Elections*, 197 A.D.3d 1503 (4th Dep't 2021) ......... *passim*

*Burdick v. Takushi*, 504 U.S. 428 (1992) ............................................................. 13, 16

*Cargill Inc. v. Progressive Dairy Sols., Inc.*, No. 07-cv-349, 2008 WL 2235354 (E.D. Cal. May 29, 2008) ...................................................................................................... 12

*Council of Alternative Political Parties v. Hooks*, 179 F.3d 64 (3d Cir. 1999) ..... 20, 24

*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) ............................. 11

*Davies Warehouse Co. v. Bowles*, 321 U.S. 144 (1944) ............................................... 11

*Davis v. City of New York*, No. 99-cv-4955, 2003 WL 22832165 (S.D.N.Y. Nov. 25, 2003) ............................................................................................................................ 12

*Lawrence v. Blackwell*, 430 F.3d 368 (6th Cir. 2005) ..................................... 19, 20, 22

*SAM Party of N.Y. v. Kosinski*, 987 F.3d 267 (2d Cir. 2021) ..................................... 13

*Storer v. Brown*, 415 U.S. 724 (1974) .......................................................................... 17

*Swanson v. Worley*, 490 F.3d 894 (11th Cir. 2007) ..................................................... 22

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ............................. 16, 18

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) ........................................... 11

## Statutes

N.Y. Election Law § 10-108(1) ....................................................................................... 4

N.Y. Election Law § 11-204(4) ....................................................................................... 4

N.Y. Election Law § 4-114 .............................................................................................. 4

N.Y. Election Law § 6-134 ...................................................................................... 3

N.Y. Election Law § 6-138 ...................................................................................... 3

N.Y. Election Law § 6-138(3) .................................................................................. 3

N.Y. Election Law § 6-158(1) .................................................................................. 4

N.Y. Election Law § 6-158(9) .................................................................................. 4

N.Y. Election Law § 8-100(1)(a) ............................................................................. 4

N.Y. Election Law § 8-600(1) .................................................................................. 4

N.Y. Laws 2019, Ch. 5 ............................................................................................ 4

**Treatises**

Wright and Miller, 8A Fed. Prac. & Proc. Civ. § 2053 (3d ed. 2022) .................. 12, 13

**Rules**

Fed. R. Civ. P. 26(a)(1)(A)(ii) ................................................................................ 10

Fed. R. Civ. P. 56(a) .............................................................................................. 11

Fed. R. Civ. P. 56(c) .......................................................................................... 12, 16

Fed. R. Civ. P. Rule 37(c)(1) .................................................................................. 12

## I.    PRELIMINARY STATEMENT

This is a case with no disputes of material facts. The sole question before the court is a question of law: Is New York's independent nominating petition deadline of May 25 unconstitutional as applied to a "sore loser" incumbent mayoral candidate who lost his Democratic Party primary reelection bid and then attempted to run as an independent candidate by filing a petition nearly three months after the deadline, and who makes no allegation that he would have had any difficulty meeting the statutory deadline? As the Fourth Department correctly held on the merits last year in this very dispute, the answer is no. The law should be upheld.

In June 2021, the sitting Mayor of Buffalo, Byron Brown, lost the primary election to be the Democratic nominee for Mayor. Months after his primary loss, and nearly three months after the May 25, 2021 state-law deadline to submit a petition to be nominated as an independent candidate, Brown submitted a petition purporting to have signatures sufficient to appear on the ballot as the nominee of the "Buffalo Party." Defendant Erie County Board of Elections rejected the petition as untimely. Brown brought a state court action, and his supporters brought this case, both requesting as emergency relief that Brown's name be added to the ballot because the petition deadline was unconstitutionally early. This Court initially granted that request, and the state court followed, but the Second Circuit quickly stayed this Court's entry of a preliminary injunction, and the Fourth Department reversed the state court order on the merits. Brown thus did not appear on the ballot. Instead, he ran as a write-in candidate for a fifth term. He won re-election with 58% of the vote.

Several of Brown's supporters still pursue this case, contending that New

York's deadline for the submission of independent nominating petitions is unconstitutionally early. This Court should grant summary judgment for Defendants.

*First*, more than a year after this case was filed, there are neither allegations nor evidence in the record from which this Court could conclude that Plaintiffs have been burdened by the May 25 deadline. Plaintiffs' single piece of supporting evidence is an expert report by a long-time advocate for minor parties, and the report's author did not even review the complaint in this case or the facts of the 2021 Buffalo mayoral election, much less analyze any supposed evidence of the burden imposed by New York's deadline on the Plaintiffs in this case. Without evidence in the record to support their as-applied challenge, Plaintiffs cannot create a dispute of material fact sufficient to take this case to trial. There is nothing to try.

*Second*, even assuming that there is some unspecified burden on Plaintiffs from not being permitted to submit an independent nominating petition many months after the statutory deadline, the State's well-established interests in regulating elections outweigh whatever interests Plaintiffs could theoretically assert. As the Fourth Department correctly held last year in the context of this very dispute, the new deadline for independent nominating petitions as applied to candidates like Brown (and his supporters) is justified by, among other interests, prevention of sore loser candidacies, efficient election administration, and compliance with federal law. Caselaw is clear that this Court may not substitute its judgment of some idealized electoral system for the one the Legislature itself designed. Summary judgment for Defendants should be granted.

## II.   STAUTORY BACKGROUND

### A.   There are two ways for candidates to appear on a ballot.

There are two ways a candidate for local office in New York can secure a spot on the general-election ballot: (1) the party-primary process and (2) the independent-candidate process. To pursue the party-primary process, a candidate files a designating petition signed by a fixed number of registered voters belonging to their political party. *See* N.Y. Election Law § 6-134. To pursue the independent-candidate process, a candidate must file an independent nomination petition signed by a fixed number of registered voters. *Id.* § 6-138. Independent candidates may designate an "independent body" making the nomination, so long as that name is not confusingly similar to a political party. *Id.* § 6-138(3). Thus, independent candidates in New York essentially run as members of political parties of their own choosing, albeit parties that are not officially recognized by the State and do not have a primary process.

In New York, unlike many other states, the two paths to the general ballot are not exclusive; New York permits candidates to run on multiple ballot lines, which is known as "fusion voting." Thus, if candidates want to maximize the odds of appearing on the general-election ballot, they can compete in the party primary while also seeking independent nominations. Candidates regularly do appear on multiple ballot lines and have their votes aggregated. Byron Brown, for example, appeared on the ballot for multiple parties in 2017 (Democratic, Working Families, Independence, Women's Equality), 2013 (Democratic, Conservative, Working Families, Independence), and others. Movant's Statement ¶¶ 1, 2.

New York's timing rules ensure that candidates can make an informed choice

3

about whether to pursue the party process, the independent process, or both: candidates must declare their involvement in the party-primary process two months before they must declare their intent to seek nomination as an independent. *Compare id.* § 6-158(1), *with id.* § 6-158(9). After candidates learn who will compete against them in the party primaries, they have plenty of time to decide whether they should also consider the independent process.

The following table summarizes deadlines set by statute, as they applied in 2021 (see https://perma.cc/TSG4-28GS for the public 2021 elections calendar)

| Date | Deadline | N.Y. Election Law |
|---|---|---|
| March 25, 2021 | Designating petition for Democratic primary due | § 6-158(1) |
| May 25, 2021 | Independent nominating petition due | § 6-158(9) |
| June 22, 2021 | Primary election | § 8-100(1)(a) |
| September 9, 2021 | Certification of candidates for general election | § 4-114 |
| September 17, 2021 | Mail ballots to overseas voters mailed | §§ 10-108(1); 11-204(4) |
| October 23, 2021 | First day of early voting for the general election | § 8-600(1) |
| November 2, 2021 | General election | § 8-100(1)(c) |

**B.     The Legislature alters the calendar in 2019.**

These deadlines were most recently altered by a 2019 election law, N.Y. Laws 2019, Ch. 5. The stated impetus for the 2019 changes was to "ensure that New York State's election law complies with the federal Military and Overseas Voter Empowerment (MOVE) Act." Movant's Statement ¶ 3. In particular, in 2012, New York was sued by the federal government because its timelines did not permit it to

transmit general election ballots 45 days before the election, as was required for elections for federal office. The resulting injunction meant that, beginning in 2012 until the law's passage, New York had at least two different primaries: a federal primary in June and a state and local primary in September, plus there was a separate a presidential primary every four years. Movant's Statement ¶ 4. The Legislature identified at least three clear benefits to creating earlier deadlines for all offices and "merging the federal non-presidential and state primaries": the earlier, unified primary would [1] "ensure that military personnel and New Yorkers living abroad have an opportunity to vote . . . [2] prevent New Yorkers from having to go out and vote in three separate primaries [in years in which there is also a presidential primary]. . . and by reducing the number of primary days, county boards of elections throughout New York State will see a collective cost savings of approximately $25,000,000." Movant's Statement ¶ 5. The bill received strong bipartisan support. It passed the Assembly 120-42 on January 14, 2019 and then passed the Senate 53-8 the next day. Movant's Statement ¶ 6.

When the revised bill hit the desk of then-Governor Andrew Cuomo, the materials he reviewed contained near-universal messages of support. The State Board of Elections, which had been asked by the executive branch to evaluate the legislation, submitted an 11-page report that explained, in detail, the rationale for many of the changes, including the timing changes here. The memo explained that moving up the deadlines, including the deadline for an independent nominating petition, would provide (1) "political stability," because it "encourages independent

nominations to be about independent ballot access and not about party candidate sore losers getting on the ballot or party candidate seeking an extra ballot position"— though, of course, candidates could still seek access on multiple lines; (2) it "promot[ed] a fair electoral process" by setting the independent petition deadline relatively soon after the party deadline and not allowing "independent parties to file on a considerably later date" which could "unduly give independent candidates a significant advantage"; (3) it helped support an "informed electorate" because voters would know all those with ballot access around the same time, and major party nominees would not have "four months of additional exposure"; and (4) it would further "administrative need" because election officials "have a strong interest in ensuring that a ballot is constructed in a timely and orderly fashion," and it would also ensure litigation is settled early.[1] Movant's Statement ¶ 7.

By contrast, the Board concluded the "burdens on independent candidates are minimal given "(i) the proximity to the party candidate petition process, (ii) New York's six-week period to collect independent nominating signatures from a larger population of voters than party candidate have available, and (iii) the relatively low signature requirements for independent ballot access." Movant's Statement ¶ 8. The New York City Bar Association had similar views and noted that "[u]nder the reformed calendar," signature gathering "can occur at a time when people are more

---

[1] This case illustrates that a deadline as late as August, which is when Brown filed his petition, does not leave nearly enough time to settle litigation. The emergency hearing was held on the Friday before Labor Day weekend, and there was a very brief time to appeal. The case now continues more than one year later.

available and accessible." Movant's Statement ¶ 9.

There was a single dissenting voice, and it was Plaintiffs' expert here, Richard Winger. Winger is a Libertarian who is among the country's leading advocates for broad ballot access for independent and minor party candidates, and he publishes the long running newsletter and website *Ballot Access News*. He wrote to Governor Cuomo and attached an article from his newsletter arguing that the new law "injures ballot access" because the deadline would be too early for "minor party and independent candidates." Movant's Statement ¶ 10. Governor Cuomo signed the bill on January 24, 2019. Movant's Statement ¶ 11.

## III.   THIS CASE AND RELATED PROCEEDINGS

### A.   Earlier proceedings in this Court and state court.

On June 22, 2021, India Walton defeated Byron Brown and others in the Democratic Primary for Mayor of Buffalo.[2] Movant's Statement ¶ 12. After his primary loss, Brown initially launched a write-in campaign for the general election. He also apparently began gathering signatures to appear as an independent candidate nominated by the "Buffalo Party" independent body, but the Complaint does not reveal how vigorous that campaign was, and Plaintiffs have disclosed no evidence of the details during discovery. *See* FAC ¶ 27. What is clear is that nearly two months after his primary loss, on August 17, 2021, Brown filed an independent nominating petition with the Board to place him on the general election ballot as a candidate. Movant's Statement ¶ 13. The Board duly rejected this petition because

---

[2] Walton was previously an Intervenor has since been dismissed.

the deadline under Election Law § 6-158(9) was May 25, 2021, making the petition 84 days late. Movant's Statement ¶ 14. By statute, the Board is required to "determine the candidates duly nominated for public office" in the jurisdiction, N.Y. Election Law § 4-114, and it is undisputed that Brown was not duly nominated. Thus, because no candidate for Buffalo mayor qualified to run as a Republican or for any other party, the Board's list of qualified candidates included Walton as the only candidate qualified to appear on the general election ballot. Movant's Statement ¶ 15.

On August 30, 2021, supporters of Brown brought this suit and sought a temporary restraining order against enforcing New York's statutory deadlines and requiring the Board to place his name on the ballot. The Complaint contains a single claim for relief: that, as applied to Brown and his supporters, enforcement of the deadline for independent candidates to appear on the ballot violates the First and Fourteenth Amendment. FAC ¶ 31. Brown himself also brought a state-court action.

Plaintiffs sought a TRO to place Brown's name on the ballot, and this Court held an emergency hearing on Friday, September 3, 2021. That was only two weeks before the Board was required by statute to mail ballots to certain overseas voters who had already applied to receive ballots by mail. N.Y. Elections Law §§ 10-108(1); 11-204(4). In a ruling from the bench following the emergency hearing, this Court granted the request and entered a preliminary injunction that would have required Brown's name to appear on the ballot. ECF No. 28. A New York state trial court also ordered that Brown's name appear on the ballot. *Brown v. Erie Cnty. Bd. of Elections*, 197 A.D.3d 1503, 1504 (4th Dep't 2021) (describing prior history).

**B.      The Second Sircuit stays this Court's injunction, and the Fourth Department also reverses.**

There were immediate appeals in both this Court and the state court. On September 16, one day before ballots were to be mailed overseas, both appeals courts halted the entry of the respective injunctions. The Second Circuit's emergency order staying this Court's injunction lacked a discussion of the merits. ECF No. 45 (Order).

The Fourth Department, though, rejected Brown's claim on the merits and held that the deadline, as applied here, is constitutional. The court noted that a "'reasonably diligent candidate' could be expected to meet New York's requirements for independent candidates and gain a place on the ballot," and reasoned that the "combination of rules for independent candidates in New York . . . is similar to election regulations in other states that have been found not to impose a severe burden on the constitutional rights of candidates and voters." *Brown*, 197 A.D.3d at 1506. The Fourth Department's conclusion was further supported by the fact that the constitutional challenge arose in the context of a "local election that does not implicate any national interests" and that Brown himself—the incumbent mayor who had run in but lost a Democratic primary—was "far from the archetypal 'independent candidate' whose interests [caselaw] seek[s] to protect." *Id.* Brown did not appeal either decision, and his name did not appear on the ballot.

On election day, Brown won re-election as a write-in candidate with over 58% of the vote. Movant's Statement ¶ 16. He is currently serving in his fifth term as mayor of Buffalo.

### C.     Developments since the Second Circuit's stay.

The appeal of the injunction was mooted by the election. The Second Circuit thus vacated the order entering a preliminary injunction and returned the matter to this Court with a clean slate. ECF No. 53. The parties had until November 1, 2022 to complete discovery. During that time, the parties have had ongoing obligations to disclose copies "of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). Plaintiffs disclosed a single document: an expert report by Richard Winger, the aforementioned publisher of *Ballot Access News*.

Because there are no disputed facts that a trial could resolve, Defendants now bring this Motion for Summary Judgment.

## IV.    ARGUMENT

Summary judgment should be granted for two related but independently sufficient reasons. *First*, Plaintiffs have not met their burden to produce any evidence that their right to vote was burdened because New York's petition deadline for independent candidates was May 25. *Second*, even assuming that there is some minimal burden from that deadline, the state's various interests—including compliance with federal law, election administration, voter education, and furthering party stability by discouraging sore loser candidacies—more than outweigh that restriction as applied here, as the Fourth Department correctly concluded in the related state-court proceeding.

10

## A.     There is no evidence to illustrate how New York's petition deadline burdened Plaintiffs.

### 1.     *Plaintiffs have the double burden to overcome the presumption of constitutionality and produce evidence to make their case.*

Plaintiffs face two threshold obstacles to success: they must overcome the presumption of a law's constitutionality, and they must produce affirmative evidence to support their case. As a threshold matter, "[s]tates are . . . entitled to adopt 'generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself.'" *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995). Thus, "[w]hen evaluating a neutral, non-discriminatory regulation of voting procedure, '[courts] must keep in mind that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Crawford v. Marion County Election Board*, 553 U.S. 181, 19–20 (2008) (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 329 (2006) (final alteration in original)); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("the good faith of [the] state legislature must be presumed." (quotation marks omitted)). Thus, as a constitutional matter, Plaintiffs have an affirmative burden to show that the law here overcomes the well-worn "presumption of constitutionality." *See Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944) ("State statutes, like federal ones, are entitled to the presumption of constitutionality.").

Plaintiffs also have a procedural obligation. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, the question for the court at this point is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

Plaintiffs may not rely on just any piece of evidence at this stage to create a dispute of material fact. Parties must rely on admissible evidence "in the record." *See* Fed. R. Civ. P. 56(c). That means, essentially, deposition transcripts, materials subject to judicial notice, and documents parties have produced on their own during discovery or in response to discovery requests. That is because "if [a] party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion." Fed. R. Civ. P. Rule 37(c)(1). Thus, "[w]hen a party has not provided disclosure as required by Rule 26(a)(1), Rule 37(c)(1) directs courts to deny use of the information by the party that failed to provide the disclosure." Wright and Miller, 8A Fed. Prac. & Proc. Civ. § 2053 (3d ed. 2022); *see also Davis v. City of New York*, No. 99-cv-4955, 2003 WL 22832165, at *1 (S.D.N.Y. Nov. 25, 2003) ("This Court will not consider the [] Declaration as it was disclosed for the first time in the summary judgment motion."); *Cargill Inc. v. Progressive Dairy Sols., Inc.*, No. 07-cv-349, 2008 WL 2235354, at *10 (E.D. Cal. May 29, 2008) ("[Defendant] may not submit declarations containing previously undisclosed information in opposition to a summary judgment motion to raise triable issues of fact.").

        2.    *There are neither allegations nor evidence of any burden on Plaintiffs, and so no dispute of material fact.*

To evaluate a generally applicable law related to election administration,

courts use the so-called *Anderson*/*Burdick* framework under which a court balances the "character and magnitude of the asserted injury" to associational rights against the "interests put forward by the State as justification for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). Where, as here, a law imposes only a "reasonable, nondiscriminatory restriction[]" on the rights of voters, the state's "important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434. As the Second Circuit recently said, for "party-qualification requirements . . . [r]eview under this balancing test is quite deferential, and no elaborate, empirical verification is required to sustain the restriction." *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 274 (2d Cir. 2021) (internal citation omitted).

But regardless of what state interests justify the law here—and there are several that are more than sufficient, *see infra* Section IV.B—this Court need not even consider them, because Plaintiffs have not and cannot show that the law burdened them at all. The First Amended Complaint contains *no* allegations regarding *any* hardships or burdens Brown and his supporters faced from the imposition of an independent nominating petition deadline of May 25. *See generally* FAC. Nor have Plaintiffs disclosed any evidence, in any form, that would provide evidence that the Plaintiffs' voting or associational rights were burdened at all. And, as explained above, they may not rely on unproduced declarations or other similar evidence, because discovery is closed. *See supra* (citing, among others, Fed. Prac. & Proc. Civ. § 2053).

Nor can Plaintiffs attempt to assert generalized burdens that apply to all independent candidates, because, as they state in the first line of the operative Complaint, "[t]his is an as-applied constitutional challenge to New York's petition deadline for independent candidates." FAC ¶ 1. Given that limitation, it is no wonder they could produce no evidence that this law burdened them. After all, their preferred candidate was not an independent politician who tried, but failed, to collect independent nominating signatures by the statutory deadline, and Plaintiffs put forth no reason why Brown did not choose to gather signatures before the May 25 deadline. Thus, there was no burden on the actual mechanics of signature-gathering or running as a true independent. Finally, Plaintiffs' preferred candidate won the general election—so the petition deadline was obviously not a conclusive obstacle to his election. That leaves nothing for Plaintiffs to draw upon to show they suffered any burden from New York choosing May 25 as the date for the petition deadline rather than their preferred date of August 17.

Plaintiffs did produce one expert report, but, contrary to supporting their case, it only illustrates the holes in their evidence. The expert report is essentially an amicus brief from an advocate for minor-party ballot access, and it does nothing to illuminate what burden the law at issue imposed on these Plaintiffs. The expert, Richard Winger, admitted that his view of the burdens imposed this law were generalized to independent candidates, and had nothing to do with these Plaintiffs or the 2021 election for mayor of Buffalo:

> Q: What information did you use to analyze the scope of those burdens that you discussed?

A: My knowledge of the history of minor parties and independent presidential candidates. And to a lesser extent, I've had many conversations over the years with groups that were petitioning people who were heading up petition drives. And I learned, I haven't done much petitioning myself, but I've learned a lot from them about the importance of having access to large gatherings of voters outdoors. Which are more common in the summer.

Q: And did you ask anyone about the burden specific to Mayor Brown's voters in 2021?

A: No.

Q: Did you ask anyone about the burden specific to the plaintiffs in this case in 2021?

A: No.

Winger Tr. 15:19–16:10 [App. 098–99].

Winger also admitted that he had reviewed neither the complaint nor any materials that could provide evidence for how Plaintiffs were burdened here:

Q: . . . Have you—do you recall reviewing the complaint in this case before you prepared your declaration?

A: No, I didn't.

Q Okay. How about the amended complaint—

A: No.

Q: —Before you prepared your declaration?

A: No.

Q: Okay. How about any of the materials, the factual materials or record materials submitted by either party in support or against the preliminary injunction and TRO motions in September of 2021?

A: No.

Winger Tr. 34:20–35:7 [App. 117–18].

15

The expert report is thus irrelevant to this as-applied challenge. FAC ¶ 1. The discussion in Winger's expert report related to how New York's petition deadline impacts minor party candidates generally or those who try, but fail, to collect necessary signatures in April or May has not nothing to do with the claims in this case. The question here is how New York's law burdened *these Plaintiffs*. On that score, there is literally zero evidence "in the record" to support any burden. *See* Fed. R. Civ. P. 56(c). That alone is enough to conclude that Plaintiffs have not met their burden to produce evidence sufficient to overcome the law's presumption of constitutionality.

## B. The State's interests in regulating elections outweigh Plaintiffs' interest in getting a second bite at the apple.

### 1. *States are permitted to bar sore loser candidates from appearing on the ballot.*

Notwithstanding the lack of evidence Plaintiffs have produced, it is clear in this case that the state's interests in regulating elections outweigh whatever minimal burden the law imposes on voters like who, as in the vast majority of states, did not get to see their preferred candidate achieve a place on the ballot after the candidate lost a party primary.

The Fourth Department correctly analyzed the issue in its opinion rejecting the same claim that Plaintiffs make here. "States 'retain the power to regulate their own elections' and are permitted to 'enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'" *Brown*, 197 A.D.3d at 1505 (quoting *Burdick*, 504 U.S. at 433 and then *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). "The totality of a state's overall plan of election

regulation should be considered in determining the severity of the restrictions." *Id.*
(citing *Storer v. Brown*, 415 U.S. 724, 737 (1974)).

Here, as the Fourth Department correctly concluded, the regulation is not a
"severe" burden on candidates and their supporters, because independent candidates
are not barred from the ballot. *Id.* They must merely comply with the regulations in
the law: the collection of sufficient signatures during the relevant time period and
submission by the deadline. *Id.* Thus, "[b]ecause a reasonably diligent candidate
could be expected to meet [these] requirements," and the reasonable time period and
number of signatures "do not unfairly discriminate against independent candidates,"
the Fourth Department held that the deadline "places only a minimal burden on the
constitutional rights of those candidates and their voters." *Id.* at 1506 (internal
citation omitted).

The Fourth Department was correct that, at most, the burden on these
Plaintiffs is "minimal." According to a 2015 article by Plaintiffs' expert Richard
Winger, New York is one of only five states that does not have a formal "sore loser"
law. Movant's Statement ¶ 18. Sore loser laws prohibit candidates who have lost in
the primary for an office from appearing on the ballot for another party in the general
election, and the U.S. Supreme Court has upheld the state interest in preventing sore
loser candidacies, in particular as applied to state or local candidacies. *Storer*, 415
U.S. at 736 (upholding California sore loser statute). Indeed, *Storer* specifically
rejected Plaintiffs' argument here when the Court stated that the state interest in
"the stability of its political system" was "compelling" and in fact "outweigh[s] the

interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status." *Id.* That alone dispenses with any possible challenge here, but New York did not even go as far as California did in *Storer*, because in New York, sore loser candidates are not categorically barred from the ballot in general elections. But, while New York formally permits sore loser candidacies, state election law still discourages such candidacies by requiring that major-party candidates at least make known their intentions to seek the nomination of other parties during the primary season. Thus, even if New York law does impose some burden on candidates and their supporters who wish to preserve the option of running a sore loser candidacy, that burden is immensely lighter than the complete ban that the vast majority of states have enacted. If a state's interest in preventing sore loser candidacies is sufficient to sustain even the burden of a *total* ban on appearing on the ballot in the general election, *see Brown*, 197 A.D.3d at 1506–07 (observing that "[s]tates are constitutionally permitted to preclude candidates who lose one primary election from subsequently running on another ballot line."), it follows necessarily that the far lighter burden here is constitutional.

   2. *Several other state interests support the deadline as applied here.*

  The law is also supported by several other state interests that have been repeatedly upheld. Indeed, the Fourth Department also identified three more interests in the deadline more broadly: "ensuring the integrity and reliability of the electoral process" (citing, among others, *Anderson*, 460 U.S. at 788 n.9); "promoting political stability at the expense of factionalism" (citing, among others, *Timmons*, 520 U.S. at 366–67), "and upholding the state's administrative duty to meet federal

deadlines for the mailing of overseas and military ballots" (citing *Lawrence*, 430 F.3d at 375). *Id.* at 1507. As mentioned above (at Section II.B), other state interests were identified during the legislative process, including the need to resolve election contests early because of their increasing frequency and the summer break of the New York judiciary, the costs saved by unifying the federal and state primaries, and the possible advantage to gathering signatures in the spring rather than the fall.

It is beyond dispute that the new law furthers these objectives. As Defendants' representative testified at a deposition, the Erie County Board of Elections administers hundreds of elections each year with a relatively minimal staff. Thus, if, in the ordinary course, "a petition was filed as late as this petition, it would just create pure chaos at the Board." MacKinnon Tr. 36:2–4 [App. 160]. That is because the Board had "38 different items that go to 851 election districts that all need to be sorted and put together." Movant's Statement ¶ 19. Giving election officials more time to do their work, as the 2019 law did, helps them do their jobs better.

Plaintiffs' expert thinks that the Legislature gave its election administrators too much time under the current law. He claims that New York's deadline for independent nominating petitions is now the "third earliest in the nation" and claims that he "know[s] of no reason why New York's election officials and courts would need more time than 46 other states to process challenges to petitions submitted by independent candidates." Winger Rep. ¶ 70, 72. But the Legislature did not set the May 25 deadline in a vacuum, and Winger by his own admission made no attempt to actually understand the specific facts at issue here.

Since New York decided to move its primary to June, as it was entitled to do, making the deadline for independent nominating petitions as late as July or August would have granted independent and minor-party candidates many months of more time to gather signatures and decide to run for office than major-party candidates had. As state officials were aware, this kind of favoritism for independent candidates can cause constitutional problems. The State of Board of Elections told the Governor in a memo that "[an] August filing date for independent candidates is inequitable to party nominees." Bill Jacket 17 [App. 019] (citing *Council of Alternative Political Parties v. Hooks*, 179 F.3d 64 (3d Cir. 1999), for the proposition that "a state has a strong interest in treating all candidates equally, and allowing independent parties to file on a considerably later date after the major party's primary would unduly give independent candidates a significant advantage."); *see also Lawrence*, 430 F.3d at 374 ("[T]here is nothing in the case law which suggests that a state is required to give independent candidates the advantage of jumping into a race in response to late-breaking events which impact the political landscape when major parties do not have the same flexibility."). Faced with a choice between moving *all* deadlines up in step or keeping the ballot open for months for independent candidates, thereby raising constitutional concerns, the State was permitted to make the former choice.

In any event, Plaintiffs cannot be heard to complain about a deadline of May 25 given that the petition in this case was filed on August 17, which meant it would have been untimely in all but roughly 15 states according to Plaintiffs' own expert.

Movant's Statement ¶ 21.[3] The real question, then, is whether, as applied here, the state's various interests support rejecting the months-overdue petition here. They do.

Plaintiffs previously wished to minimize the facts and make this case a pure referendum on whether a May 25 deadline is constitutional in a vacuum. As already stated, that is not the right analysis for this as-applied challenge, especially at the summary judgment stage, when Plaintiffs are required to produce evidence specific to their case to create a dispute of material fact. Nor would a simple comparison of deadlines across all states be appropriate because, as the Fourth Department correctly noted, "[t]he totality of a state's overall plan of election regulation should be considered in determining the severity of the restrictions." *Brown*, 197 A.D.3d at 1505. Because few other states have fusion voting, the vast majority of states formally prevent sore loser candidacies, and the New York signature requirement is relatively modest, the overall burden on true independent candidacies from the 2019 election was less than it would have been in most other states. Considered as a whole, the scheme passes constitutional muster because the State interests outweigh the minimal burden on genuine independent candidacies.

Still, as the Fourth Department noted, the scheme here "is similar to election regulations in other states that have been found not to impose a severe burden on the constitutional rights of candidates and voters." *Id.* at 1506. Indeed, several other Circuits have upheld petition deadlines materially indistinguishable from the one

---

[3] For unclear reasons, the appendix to Plaintiffs' expert report lists the deadlines to file independent petitions to run for President in 2024. The comparison is thus imperfect but still instructive.

here in that they both 1) required independent candidates to submit petitions on or before the party primaries concluded and were 2) in the spring or early summer.

For instance, in *Swanson v. Worley*, 490 F.3d 894 (11th Cir. 2007), the Eleventh Circuit upheld an Alabama law according to which "independent candidates seeking ballot access must submit a petition with [required signatures] by the first primary election date, which is the first Tuesday in June." *Id.* at 896. Given that Plaintiffs here do not allege they possibly could have submitted a petition before they knew that Brown had lost the primary, the facts of *Swanson* are indistinguishable from those here. The Sixth Circuit reached an identical conclusion in *Lawrence v. Blackwell*, when it upheld an "Ohio election statute which requires independent congressional candidates to file a statement of candidacy and nominating petition . . . by the day before the primary election," which was in either March or May, depending on the cycle. 430 F.3d at 369–70. Given the facts here and the nature of the as-applied challenge, there can be no dispute that, if *Lawrence* or *Swanson* were binding on this Court, Defendants must prevail. While neither they nor the Fourth Department's decision in this very dispute technically bind this Court, all three decisions faithfully apply settled law to facts either identical to, or indistinguishable from, those here. They should be followed.

>    3.   *The facts in* Anderson *were very different from here.*

In its injunction decision, which was (necessarily) hastily made and based on an incomplete record, this Court relied heavily on the Supreme Court's decision in *Anderson v. Celebrezze*. Sept. 3. Tr. 80–82 [ECF No. 35]. That case invalidated Ohio's deadline of March 20, 1980 to obtain a place on the ballot as an independent

presidential candidate for the 1980 general election. 460 U.S. at 782. But, as the Fourth Department recognized, *Anderson* is readily distinguishable because "a Buffalo mayoral race [is] a local election that does not implicate any national interests." *Brown*, 197 A.D.3d at 1506. The court continued by noting that "[m]ost cases that have struck down state election laws as unconstitutional have done so in the context of their impact on federal elections, events in which the national interest is greater and the state interest is less important." *Id*. That makes sense: Ohio's early deadline in a presidential election effectively prohibited John Anderson from taking advantage of later deadlines in other states to mount a viable candidacy. But here, there is only one election at issue. The rules of the road were the same for all candidates, and they were known well in advance of the election. The state's interest in enforcing a deadline that it thought best for its state and local electoral system is high, and there is no countervailing national interest like there was in *Anderson*.

*Anderson* is distinguishable in several other ways. With regards to the State's interest in political stability, the Court expressly distinguished *Anderson* from its earlier decision in *Storer v. Brown*, which had upheld sore loser laws, because the Plaintiff in Anderson was not a sore loser candidate and because "the State's interest in regulating a nationwide Presidential election is not nearly as strong [as it is in a local election]; no State could singlehandedly assure 'political stability' in the Presidential context." *Anderson*, 460 U.S. at 804. But here, the plaintiff is a sore loser candidate and the election at issue is local. This case thus present facts that are opposite to those the Court found relevant in *Anderson*.

And then there is this additional major distinction: in *Anderson*, "the early filing deadline d[id] discriminate against independents," in part because major-party presidential candidates were not chosen until conventions in the summer, but Ohio's statute forced Anderson to submit a petition by March to appear on the ballot. *Id.* But here, not only is there no discrimination against independents, but *Plaintiffs* are the ones who wish to *introduce* discrimination by granting independents many months more time to choose whether to run. Thus, this case is unlike *Anderson* and more like, say, *Council of Alternative Political Parties*, in which then-Judge Alito rejected a similar challenge to that here because what those plaintiffs were "seeking cannot be termed equal treatment. On the contrary, they are asserting a constitutional right to preferential treatment" in the form of a deadline months *later* than the deadline for major party candidates. 179 F.3d at 74. What is more, here, unlike in both *Anderson* and even *Council*, Brown did not even have to choose: he could have run as both an independent *and* as a Democrat. Plaintiffs have not even attempted to allege that he had a reason not to do so or that he could not have easily met the May 25 deadline if he had tried to. Byron Brown in 2021 is simply not similarly situated to John Anderson in 1980.

\* \* \*

The Plaintiffs in this case have given this Court no reason to depart from the Fourth Department's 2021 conclusion that, as applied to Byron Brown's second-chance attempt to appear on the ballot in 2021, New York's scheme for placing independent candidates on the ballot is constitutional. Plaintiffs have provided no

evidence (or even allegation) that the relevant deadline imposed any specific burden on their rights to vote or associate. But even if the Court assumes that the scheme creates some sort of burden on those in Plaintiffs' situation, the burden is minimal, and several important state interests—including in efficient and cost-effective election administration, compliance with federal law, preventing sore loser candidacies, and equal treatment of all candidates—individually and collectively outweigh that burden. Finally, this as-applied challenge provides no way for this Court even to consider how the deadline impacts the candidacies of true independent or third-party candidates, but even if the Court did so, the Legislature acted well within its discretion when it crafted the scheme as a whole. The law is constitutional.

## V.    CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion for Summary Judgment and enter judgment for Defendants.

Respectfully submitted,

/s/ JEREMY TOTH
Jeremy Toth
SECOND ASSISTANT COUNTY ATTORNEY, ERIE COUNTY
95 Franklin St., 16th Floor
Buffalo, NY 14202
(716) 858-2204
Jeremy.Toth@erie.gov

/s/ JASON HARROW
Jason Harrow
GERSTEIN HARROW LLP
810 7th St. NE
Suite 301
Washington, DC 20002
(323) 744-5293
jason@gerstein-harrow.com